Edwin **RODRIGUEZ–GARCIA, et al.,**
**Plaintiffs, Appellants,**

v.

Esteban **DAVILA, etc., et al.,**
**Defendants, Appellees.**

No. 89–1023.

United States Court of Appeals,
First Circuit.

Heard Oct. 31, 1989.
Decided May 22, 1990.

---

Frank Rodríguez García, with whom Francisco J. Rodríguez Juarbe, were on brief for plaintiffs, appellants.

Gilberto Mayo Aguayo, with whom Mayo & Mayo, were on brief for defendants, appellees.

Before TORRUELLA, Circuit Judge, COFFIN, Senior Circuit Judge, and LAFFITTE,* District Judge.

TORRUELLA, Circuit Judge.

This is an appeal from an order of the United States District Court for the District of Puerto Rico granting summary judgment and dismissing appellants' claims based in 42 U.S.C. § 1983 and § 1985(3), together with a diversity jurisdiction claim.[1] Appellants also appeal an award of costs in favor of appellees. Because we

---

\* Of the District of Puerto Rico, sitting by designation.

1. In addition to granting summary judgment against appellants on 42 U.S.C. § 1983 and 42 U.S.C. § 1985 claims, the district court dismissed several other of appellants' claims based on lack of complete diversity of citizenship among the parties. Although it is clear that the district court had jurisdiction pursuant to 28 U.S.C. § 1343 for the sections 1983 and 1985 claims, jurisdiction, as the district court noted, is problematic with regard to the state law claims. Appellants, however, do not appeal the latter denial of jurisdiction.

find that no state action was involved in appellants' dismissals, we affirm the district court's grant of summary judgment, as well as its award of costs to appellees.

## I. BACKGROUND

The Puerto Rico Maritime Shipping Authority, which is perhaps better known as Navieras, is an agency of the government of Puerto Rico which was created to facilitate maritime transportation of cargo and passengers to and from Puerto Rico. 23 L.P.R.A. § 3051, *et seq.* To promote this objective, the Puerto Rican government purchased three shipping companies, Sea Land Service, Inc., Transamerican Trailer Transport, Inc., and Sea Train, Inc. By statute, Navieras has authority to enter into contracts with private enterprises for the management of its operations. *Id.*

Such a management contract was entered into with Puerto Rico Maritime Management, Inc. (PRMMI) in 1976. PRMMI was organized and incorporated under the laws of the State of Delaware in 1974 as a private entity. At the time of incorporation, it had no initial capitalization. Under the terms of the management contract, PRMMI agreed to provide management services for Navieras for a period of five years, the term of which was to expire on the last day of the 1981 fiscal year.

After the New Progressive Party (NPP) won the 1976 gubernatorial elections in Puerto Rico, Navieras' Enabling Act was amended to permit the government to sell Navieras, with the consent of the Legislature. During 1977, the NPP government also made the decision to acquire PRMMI, and to convert it into a subsidiary of Navieras. This acquisition was completed in 1978, with the payment of $2.8 million to PRMMI's stockholders.[2] The denouement of this purchase was, of course, that both PRMMI and Navieras were operated as an arm of the Puerto Rican government from 1978 until at least December 13, 1984.

On November 4, 1984, the Popular Democratic Party (PDP) won the general elections in Puerto Rico, and a transition committee was formed. Members of the committee included members of the new administration of Navieras and certain of those who would later become PRMMI officers, including appellee Esteban Dávila. On December 5, 1984, Roberto Lugo D'Acosta, the Executive Director of Navieras and Chief Officer of PRMMI, reported to the committee and detailed the economic difficulties facing Navieras. According to this report, as of June 30, 1984, Navieras had accumulated an operational deficit of $138,178,000 and had a projected operational deficit for the fiscal 1984–1985 year of $40,245,000. Based on this financial presage, as well as the deficit, the report recommended a 25% reduction in Navieras' workforce. PRMMI was not specifically mentioned.

Following D'Acosta's report, the committee considered a plan for reorganizing Navieras' operations. The district court found that, "[t]his 'reorganization team' considered all aspects of the reorganization of Navieras, but concentrated, at least at times, on personnel matters." On January 4, 1985, Esteban Dávila was appointed to the position of Executive Director of Navieras. Shortly thereafter, Dávila designated Sergio Casaine as President of PRMMI.

On March 4, 1985, PRMMI, with no tangible assets, was sold to a private corporation, TNT Containerships, Inc., for $1,000. At that time, Navieras and PRMMI entered into a management contract which gave PRMMI "exclusive control" over management matters, although Navieras retained certain veto powers over appointments of the president, the executive vice president, and the vice president for administration of PRMMI. Also on that date, Gerald Toomey was made PRMMI's President. Sergio Casaine was

---

2. The district court found that the $2.8 million payment primarily reflected compensation for the value of the time remaining in the management contract. This finding does not appear to be disputed on appeal. At the time of the sale,

PRMMI's stockholders included Sergio Casaine, one of seventeen vice-presidents of the corporation, and Gerald Toomey, president of the corporation.

later shifted from the presidency to Vice–President of Human Resources of PRMMI.

On March 29, 1985, José R. Vargas, Vice President of Marketing of PRMMI, delivered to appellants Edwin Rodríguez García and Lino Vega letters which immediately terminated their employment in the sales and marketing force of PRMMI. Appellants claim that their dismissals were a direct result of the change in political administration which occurred in Puerto Rico in 1984. Appellees on the constitutional claims are Sergio Casaine and José R. Vargas, vice-presidents of PRMMI, and Gerald Toomey, President of PRMMI. They are each named both in their individual capacities and as officers of PRMMI. Esteban Dávila, President of Navieras, and his wife, Ibis Dávila, are appellees on the appeal from the award of costs.[3] Neither Navieras nor PRMMI were named as party defendants.

Appellants assert that they have voluminous evidence supporting their contentions that they were fired solely for political reasons. The district court rejected their arguments, finding that the claims were merely conjectural. Appellants both contend that they were well qualified for their former jobs.

Appellants raise several issues for review. We will examine them *seriatim*.

## II. STANDARD OF REVIEW

The appellate chapter of this story opened with the district court's grant of appellees' motion for summary judgment. As is made perspicuous by the Federal Rules of Civil Procedure, summary judgment is appropriately granted when the pleadings, depositions, and other submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Because the instant action involved 42 U.S.C. §§ 1983 and 1985 claims, the issue addressed by the

district court initially was whether appellants had alleged facts sufficient to demonstrate state action.

■ A claim for relief under section 1983 must include at least two elements: first, appellants must demonstrate that they were denied some right "secured by the Constitution and laws" of the United States and, second, they must show that appellees deprived them of this right while acting "under color of state law." *E.g., Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978). The inquiry undertaken by the district court on the second requirement, that of state action, is "necessarily fact based," *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939, 102 S.Ct. 2744, 2755, 73 L.Ed.2d 482 (1982), but it can properly be the subject of summary judgment.

■ In this circuit, the standard of review for grants of summary judgment is unambiguous. As we have often stated, upon review, we will view the evidence in the light most favorable to the nonmovants, in this case, to the appellants. *E.g., King v. Williams Industries, Inc.*, 724 F.2d 240, 241 (1st Cir.), *cert. denied*, 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984); *Metropolitan Life Insurance Co. v. Ditmore*, 729 F.2d 1, 4 (1st Cir.1984); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). Thus, "[a]mong other things, apart from that which may be inherently incredible, the nonmoving party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in [the evidence] resolved favorably to him....'" *Greenburg v. Puerto Rico Maritime Shipping Auth.*, 835 F.2d 932, 936 (1st Cir.1987) (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979)). But, after taking the facts in the light most favorable to the nonmovant, "Rule 56 mandates the entry of summary judgment

---

**3.** The Dávilas filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6), based on principles of *res judicata*, because this was the second action filed by appellants, the first of which was dismissed as to the Dávilas for failure to state a

cause of action. All claims against the Dávilas were eventually dismissed, and appellants do not appeal from this judgment. They do, however, object to the amount of costs awarded to the Dávilas.

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ After careful review of the record, and application of relevant legal standards, this court is convinced that PRMMI, at least after its sale in 1985, is not an arm of the state within the meaning of 42 U.S.C. § 1983[4] and 42 U.S.C. § 1985.[5] That being the case, the district court appropriately granted summary judgment to appellees. Fed.R.Civ.P. 56(c).

## III. STATE ACTION

■ The critical question in the instant case is whether appellees' conduct constituted state action under the Fourteenth Amendment and 42 U.S.C. § 1983.[6] It is, by this time, well settled that neither section 1983 nor the Fourteenth Amendment reaches private actions. Thus, the validity of appellants' claims hinges on a demonstration of state action. *E.g., Lugar v. Edmondson Oil Co.*, 457 U.S. at 937, 102 S.Ct. at 2753. While state involvement does not have to be direct, the "conduct allegedly causing the deprivation of a federal right must be fairly attributable to the State." *Id.* Consequently, either direct or indirect state action will be considered sufficient to sustain a section 1983 action beyond summary judgment.

**4.** 42 U.S.C. § 1983 provides:

Every person who, under color of any statute ... of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

**5.** 42 U.S.C. § 1985(3) provides:

If two or more persons in any State or Territory conspire ... on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged there-

### A. Direct State Action

■ Both parties agree that on March 4, 1985, more than three weeks prior to appellants' dismissals, PRMMI was sold to TNT Containership, Inc. (TNT), a purely private corporation. "As such," the district court concluded, "the actions of PRMMI or its officers at that time are not directly the acts of the state. The only direct act of the state in the chain of events which led to the dismissal of plaintiffs was the sale of PRMMI to TNT."[7] Thus, it is the sale of PRMMI which is the "action" to be analyzed by this court.

The allegation of politically motivated dismissal by a state actor triggers the analysis propounded in *Mt. Healthy Bd. of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In that case, the Supreme Court outlined the standard to be applied in this case:

Initially ... the burden was properly placed upon respondent to show that [1] his conduct was constitutionally protected, and that [2] this conduct was a "substantial factor"—or, to put it in other words, that it was a "motivating factor" in the ... [state actor's conduct]. Respondent having carried that burden, however, the District Court should have gone on to determine [3] whether the ... [state actor] had shown by a preponderance of the evidence that it would have reached the same decision ... even in the absence of the protected conduct.

in do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, nor deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

**6.** Although appellants also raise conspiracy claims under sections 1983 and 1985(3), we will consider them *infra* at p. 100.

**7.** Because the parties do not appeal this determination, the issue as to whether PRMMI is, after March 4, 1985, a private entity for the purposes of direct state action analysis is not properly before this court. Consequently, we decline to make findings on the issue.

*Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. Thus, as the district court determined, since the only allegation of direct state action was the privatization of PRMMI through its sale to TNT, it is this conduct which must be compared to the *Mt. Healthy* standards.

■ Appellants clearly satisfy the first prong of *Mt. Healthy.* They contend that they were fired purely because of their political affiliation. It is, by this time, indubitable that political affiliation is constitutionally protected conduct. *E.g., Duffy v. Sarault,* 892 F.2d 139, 146 (1st Cir.1989). But that is only the first prong of the *Mt. Healthy* analysis. As to the second prong, appellants argue that they presented evidence tending to show that there was a genuine issue as to whether their political affiliation was a motivating factor in the sale of the PRMMI.

We, however, agree with the district court that the evidence was insufficient to show that the political views of the appellants were even *a motivating,* much less a deciding, factor in the decision to transfer PRMMI. Appellants offered no proof of the link between their political affiliation and the sale of PRMMI. The only evidence that political affiliation was a factor in the sale, was the "assumption" of witness Ortiz that those in command knew of the political affiliation of those who were ultimately fired. The undisputed facts suggest that some individuals from both parties were dismissed. Without evidence of knowledge of political affiliation, the statement overheard by Ortiz that "the only way was to transfer PRMMI back to private ownership as quick as possible so that we could continue with the plan we had" is conjecture insufficient to support the conclusion that political affiliation was a motivating factor in the sale of PRMMI. Consequently, summary judgment is appropriate on the second prong of *Mt. Healthy.*[8]

But our analysis cannot end here. As we stated above, either direct or indirect state action is sufficient to sustain a claim for relief under 42 U.S.C. § 1983 and 42 U.S.C. § 1985. *E.g., Lugar v. Edmondson Oil Co.,* 457 U.S. at 937, 102 S.Ct. at 2753. Thus, our next consideration must be whether the district court erred in finding that the evidence was insufficient to prove indirect state action.

### B. *Indirect State Action*

Having found that the evidence was insufficient to demonstrate that appellants' dismissals were direct acts of the state, our inquiry shifts to the determination of whether, due to some nexus with the state, appellants' dismissals by officials of PRMMI can be found to have occurred on the strength of state authority—in other words, by indirect state action. *See Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982). If so, then the concepts of state action and action under color of state law will permit an action under both 42 U.S.C. §§ 1983 & 1985 to lie.

■ In *Ponce v. Basketball Federation of the Commonwealth of Puerto Rico,* 760 F.2d 375, 377 (1st Cir.1985), this court summarized the inquiries relevant to the determination of when conduct by apparently private parties rises to the level of either state action or action under color of state law:

(1) whether there was an elaborate financial or regulatory nexus between appellants and the government of Puerto Rico which compelled appellants to act as they did, (2) an assumption by appellants of a traditionally public function, or (3) a symbiotic relationship involving the sharing of profits.

This being the case, we must examine the relationship of PRMMI to the government of Puerto Rico with reference to these criteria.

#### 1. *Nexus Analysis*

■ Appellants contend that the extensive regulation of PRMMI by Navieras, and the considerable financial support ac-

---

8. The district court also based its decision on the third prong of *Mt. Healthy.* After reviewing the record, we find that it is unnecessary to go that far, finding, as we do, that there is no issue of material fact with regard to the second prong. We need go no further.

corded to the corporation by the Commonwealth of Puerto Rico, provide ample basis for a finding that there is a "sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974) (cited in *Ponce*, 760 F.2d at 377). We cannot agree.

Although PRMMI was incorporated with the specific purpose of providing management services for Navieras, the provision of services to a state entity does not establish state control, even where, as here, the private contractor's sole business is the performance of public contracts. *Rendell–Baker v. Kohn*, 457 U.S. at 841, 102 S.Ct. at 2771. Nor does the fact that PRMMI receives $10 million per year in state subsidies justify a conclusion of state control, particularly where the entity generates approximately $400 million per year in revenues. *See, e.g., San Francisco Arts & Athletics v. Olympic Committee*, 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987); *Rendell–Baker*, 457 U.S. at 840, 102 S.Ct. at 2770; *Blum v. Yaretsky*, 457 U.S. 991, 1011, 102 S.Ct. 2777, 2789, 73 L.Ed.2d 534 (1982) (state paid expenses of more than 90% of the patients in the nursing home facility). *See also Gerena v. Puerto Rico Legal Services, Inc.*, 697 F.2d 447, 450 (1st Cir.1983).

The fact that the management contract and the sales agreement grant Navieras significant control over the operations of PRMMI is unpersuasive in light of extensive case law supporting a conclusion that this does not establish a regulatory nexus. In *Rendell–Baker*, for example, which involved the section 1983 claim of a dismissed teacher in a private school which was under contract with the state to educate maladjusted high school students, the Supreme Court found that no state action was involved because of the freedom accorded to the school in personnel matters. In that case, the school made all initial hiring decisions, although the hiring of some vocational counselors had to be approved by the state. We find that case to be analogous to the instant one. Here, while the management agreement gives complete freedom to PRMMI to hire most employees, approval of PRMMI's choices for President, Executive Vice President for Operations and the Vice President for Administration must be secured from Navieras. Since the agreement expressly states that approval may not be unreasonably withheld, however, and PRMMI is accorded freedom to make the initial selections, we find no significant difference between this case and *Rendell–Baker*. In the instant case, there is no nexus sufficient to support a finding of state action.

■ The test is, as appellees and the district court correctly stated, whether the government exercised coercive power or provided such significant encouragement that the choice to fire appellants must be deemed to be that of the government. *E.g., San Francisco Arts & Athletics v. Olympic Committee*, 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987); *Blum v. Yaretsky*, 457 U.S. at 1004, 102 S.Ct. at 2785; *Ponce*, 760 F.2d at 378. Although the approval of Navieras had to be secured for the hiring of senior executive officers, there is no evidence that Navieras interfered in the day to day management of PRMMI. Appellants have presented no evidence that a state entity encouraged or affirmatively induced the dismissals.

In accordance with *Blum v. Yaretsky*, 457 U.S. at 1004, 102 S.Ct. at 2785, therefore, we conclude that "the challenged action of the regulated entity ... may be fairly treated as that of the State itself ... only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." There is no evidence that the state was in any way responsible for the dismissals of appellants.

### 2. *Traditional Public Function Analysis*

■ Using the analysis of *Ponce*, indirect state action can also be demonstrated with a finding that "the state, in delegating its traditional responsibilities to appell[ees], has effectively transferred its authority to

... private parties...." *Ponce*, 760 F.2d at 381. *Jackson v. Metropolitan Edison Co.*, 419 U.S. at 352, 95 S.Ct. at 454. As this Court noted in *Ponce*, the Supreme Court has clearly elucidated the standard which must be followed:

> [O]ur holdings have made clear that the relevant question is not simply whether a private group is serving a 'public function.' We have held that the question is whether the function performed has been 'traditionally the *exclusive* prerogative of the State.' (Citations omitted).

*Rendell–Baker v. Kohn*, 457 U.S. at 842, 102 S.Ct. at 2772. While there can be little question that, at least in Puerto Rico, maritime shipping services are essential to the well-being of the public, and thus that their provision is a public function, our analysis must not end at this point. As the district court found, shipping is, at least in the Western world, "typically a function of the private sector." In *Rendell–Baker*, the Supreme Court found that although education was a public function, it was not the exclusive prerogative of the state. This court came to a similar conclusion about regulation of amateur sports in *Ponce*, and we now add to that list provision of maritime shipping services.

Consequently, we must again agree with the district court's conclusion that, "[t]he provision of education, police protection, and prisons are public functions that, when 'privatized,' still retain their public nature, and action under color of law may still be found. Clearly, however, as the parties agree, the maritime shipping industry is not a traditional public function, and § 1983 liability cannot rest on the [sic] basis."

### 3. *Symbiotic Relationship Test*

▮▮▮▮ Appellants next argue that, under the last test enunciated by *Ponce*, state action can be found by way of a symbiotic relationship, and that the district court erred by failing to so find. Under this test, defined by *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), the acts of a private party, such as PRMMI, are attributable to

the state only if the government "has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity...." *Burton*, 365 U.S. at 725, 81 S.Ct. at 862 (cited by *Ponce*, 760 F.2d at 381). Although one of the key factors in determining whether a symbiotic relationship exists is certainly whether the state shared in any profits made, *Rendell–Baker*, 457 U.S. at 843, 102 S.Ct. at 2772, we find that the district court erred in holding that it was the *exclusive* factor to the determination. While the fact of a financial partnership is instructive in the determination of a symbiotic relationship, the lack of that financial characteristic is not necessarily dispositive.

The test is one of interdependence and joint participation, rather than one of financial enrichment. In examining for the existence of such a relationship, we think that the law of Eleventh Amendment immunity is instructive, although not congruent.

It is axiomatic that the "Eleventh Amendment immunizes the states from suits for damages in federal court, in the absence of abrogation by Congress or waiver by the state." *In re San Juan Dupont Plaza Hotel Fire Litigation, Plaintiffs' Steering Committee v. Tourism Co. of Puerto Rico*, 888 F.2d 940, 942 (1st Cir. 1989). *See generally Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). It is equally well established that the Commonwealth of Puerto Rico is entitled to the same protections as those accorded to states under the Eleventh Amendment. *See Ramirez v. Puerto Rico Fire Service*, 715 F.2d 694, 697 (1st Cir.1983); *Ezratty v. Puerto Rico*, 648 F.2d 770, 776 n. 2 (1st Cir.1981).

The question of whether Eleventh Amendment immunity bars suit frequently arises when the entity sued is a creation of the state, such as a state-created corporation. *E.g., Figueroa-Rodríguez v. Aquino*, 863 F.2d 1037, 1044 (1st Cir.1988); *In re San Juan Dupont Plaza Hotel Fire Litigation*, 888 F.2d at 942.

The factors to be taken into account when determining if an entity is an *alter*

*ego* of the state are 'whether it performs a governmental function, whether it functions with substantial autonomy, to what extent it is financed independently of the state treasury, and if a judgment sought to be entered against the [entity] will be satisfied out of the state treasury.' *Culebras Enterprises Corp. v. Rivera Ríos*, 813 F.2d 506, 517 (1st Cir. 1987). Other factors relevant to the Eleventh Amendment inquiry include whether the entity 'has been incorporated; ... whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the [entity's] operations.' *Ainsworth Aristocrat International Party v. Tourism Co.*, 818 F.2d 1034, 1037 (1st Cir.1987).

*Figueroa–Rodríguez*, 863 F.2d at 1044. When these factors are taken into consideration, we come to the same conclusion as that of the district court: there is no symbiotic relationship. Although the management contract between PRMMI and Navieras is clearly beneficial to Navieras, primarily because it is terminable upon thirty days notice, certain employment contracts must be approved by Navieras, and there are restrictions on the transfer or pledge of PRMMI stock, these factors are not sufficient to support a finding of interdependence. From the evidence in the record, it appears that PRMMI is essentially independent in the conduct of its daily affairs and there is nothing to suggest that Navieras profits in any way from any discriminatory practices utilized by PRMMI. Moreover, termination of the agreement is permissible only in the event of a bulk transfer of assets, or for other good cause.

Consequently, although by a different route taken by the district court, we come to the same conclusion. Appellees' actions in dismissing appellants cannot be classified in one of the categories of private acts which may, nonetheless, be "fairly attributable to the state." *Lugar v. Edmonson Oil Co.*, 457 U.S. at 937, 102 S.Ct. at 2753 (1982). Consequently, we hold that the dismissals of appellants were not taken under color of state law for the purposes of section 1983.[9]

## IV. CONSPIRACY UNDER § 1983 AND § 1985(3)

Appellants next make the argument that they are entitled to a remedy under 42 U.S.C. § 1985(3), based on an allegation of a "conspiracy" between appellees and Esteban Dávila, Executive Director of Navieras, to deprive appellants of their First and Fourteenth Amendment rights. We find this argument peccant.

Section 1985(3) provides a cause of action for conspiracy to deprive or interfere with federally protected rights. It is conclusively established, however, that conspiracy to infringe upon First Amendment rights is actionable under section 1985(3) only if it is demonstrated that a state actor is involved, or if the purpose of the conspiracy is to "influence the activity of the State." *United Brotherhood of Carpenters and Joiners of America, Local 610 v. Scott*, 463 U.S. 825, 830, 103 S.Ct. 3352, 3357, 77 L.Ed.2d 1049 (1983).

The only evidence of state involvement in the alleged conspiracy, as the district court properly held, was the attendance of Esteban Dávila at reorganization committee meetings where the list of employees to be terminated was discussed.[10] Appellants present no evidence that Dávila either proposed the list, or that he was aware of the political affiliation or beliefs of the persons on it. Instead, the testimony of witness

---

**9.** Judge Coffin believes that the use of the Eleventh Amendment analogy may mislead by telescoping considerations appropriate to *Ponce*'s other indirect state action tests into the symbiotic relationship test. He therefore emphasizes that the Eleventh Amendment discussion is made for purposes of analogy only, and that *Ponce* continues to correctly state the law on this point.

**10.** According to appellants, Sergio Casaine, a participant in the reorganization committee meetings, together with Julio Ortiz Mercado, Esteban Dávila, Sergio Casaine, Enrique Delanoy, Víctor Carreras, Rafael Reyes, and José Rodríguez, had a list of persons who would apparently be terminated. Ortiz Mercado stated in his deposition that the list included persons who were either not of the trust of the new administration, or who were "batatas políticas,"

Ortiz said only that he assumed that Casaine and Dávila knew the political affiliation of the persons on the list. The assumption was based only on "time dedicated to the list and ... the security when they spoke." This is precisely the type of subjective characterization which we found was not actionable in civil rights cases in *Dewey v. University of New Hampshire*, 694 F.2d 1, 3 (1st Cir.1982), *cert. denied*, 461 U.S. 944, 103 S.Ct. 2121, 77 L.Ed.2d 1301 (1983) ("we insist that the claim at least set forth minimal facts, not subjective characterizations, as to who did what to whom and why."). Consequently, we believe that the district court correctly held that the state involvement, if any, was not sufficient to sustain a conspiracy claim under either section 1983 or section 1985(3).

## V. COSTS

The last issue to which we direct our attention is the decision of the district court to award costs to Esteban Dávila and his wife. The award of costs is a matter given to the discretion of the district court, which this court will review only to ensure that no abuse of discretion occurred. *Schwarz v. Folloder*, 767 F.2d 125, 131 (5th Cir.1985).

The decision of a court to award costs must be carefully tailored to the statute devoted to the taxation of costs, 28 U.S.C. § 1920. Moreover, "the discretion given district judges to tax costs should be sparingly exercised with reference to expenses not specifically allowed by statute." *Farmer v. Arabian American Oil Co.*, 379 U.S. 227, 235, 85 S.Ct. 411, 416, 13 L.Ed.2d 248 (1964). With this in mind, we turn to the items specifically contested on appeal.[11]

Appellants first contend that the district court erred in allowing costs in the amount of $880.20 for office copies, and $177.50 for outside copies. Section 1920(4) specifically permits costs to be awarded for duplication of documents used in the case. While appellants argue that this rule should be limited to copy costs for documents actually filed, we decline to accept so narrow an interpretation of the statute. Instead, we find that if the costs were reasonably necessary to the maintenance of the action, then they are allowable.

Appellees argue that many documents had to be reproduced, particularly depositions, in preparation for the announced trial date. They argue that the fact that the case ultimately was dismissed should not effect the amount of costs awarded. We agree. In light of the evidence presented by appellees, we find that the district court acted within its discretion in granting the duplication costs.

## VI. CONCLUSION

For the foregoing reasons, we find that summary judgment was appropriately granted on appellants' 42 U.S.C. §§ 1983 & 1985(3) claims because there was no state action. Moreover, we find that the district court did not abuse its discretion in awarding costs to Dávila and his wife.

The decision of the district court is, therefore, hereby *affirmed*. Costs to appellees.

literally political sweetpotatoes, or political "hacks."

11. In the brief submitted to this Court, appellants also argue that the fees awarded for postage stamps ($12.39), and for long distance telephone calls ($2.73) were excessive or improperly awarded. Since they did not make these arguments to the district court, we decline to address them now. *Construction Aggregates Corp. v. Rivera de Vicenty*, 573 F.2d 86 (1st Cir.1978). Additionally, appellants argued to the district court that the fees for translation services ($350.00) and transcription of depositions ($936.25) should have been disallowed be-

cause "[d]efendants do not present a bill for the translations by a certified translator nor for the depositions, and furthermore this case was never set for trial and the translations were never necessary." On appeal, they drop these arguments, and instead opt for the argument that the participation of Dávila's attorney in the deposition was minimal, and that neither the depositions nor the translated documents were necessary for Dávila's case. Since appellants did not make the same arguments on appeal as they made below, we decline to address either set of arguments. *See Construction Aggregates Corp.*, 573 F.2d 86.