Grant v. Civil Air Patrol            CV-91-45-B     04/03/95
                  UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW HAMPSHIRE


Carol Grant

     v.                                   Civil No. 91-45-B

Civil Air Patrol, et al.


                         O R D E R


     Carol Grant filed this action for declaratory and injunctive

relief against the Civil Air Patrol ("CAP") and several of its

officers alleging violations of the Constitution's First and

Fifth Amendments, a violation of 36 U.S.C.A. § 203 (West 1988),

contempt of court, and breach of contract.[1]  The defendants filed

a motion for summary judgment with respect to the constitutional

claims.  Defendants argue that because CAP is not a federal actor

under any of the tests promulgated by the Supreme Court, Grant

has no constitutional claim against CAP or its employees.  In

response, Grant contends that CAP, in light of its function,

staffing, and financing, is a component of the United States Air

_____

     [1]  Grant filed a motion to amend her complaint to add an
additional count alleging the defendants violated Title IX, 20
U.S.C.A. § 1681 (West 1990).  I granted that motion in a prior
order.  However, the defendants' present motion for summary
judgment does not address that count.

Force and therefore a federal actor subject to constitutional prohibitions. For the reasons that follow, I deny the defendants' motion.

**BACKGROUND**[2]

### A.   The Challenged Conduct

In 1986, Grant received a failing score on her CAP test flights, known as "check flights," allegedly because the pilot supervising the check flights did not believe women should serve as CAP pilots. Because she failed the check flights, Grant was unable to participate in certain important CAP activities such as search and rescue missions conducted at the direction of the United States Air Force. Following CAP regulations, Grant challenged this action, filing discrimination grievances with the wing commander. When these efforts proved unsuccessful and she was terminated from CAP, Grant filed suit in this court. That suit was dismissed with prejudice after the court approved the parties' stipulation in which CAP agreed to reinstate Grant to

---

[2]  On motion for summary judgment, I construe the evidence in the light most favorable to the non-movant, taking all reasonable inferences in their favor. Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988).

2

her former rank if she completed and passed a check flight conducted by an independent pilot. Grant did so and was reinstated.

After her reinstatement, Grant was denied access to further check flights for mission pilots until the summer of 1990. That summer she was permitted to take the test and passed. CAP pilots allegedly refused to administer the test to Grant and told her it was because of the 1987 suit she had filed against CAP. In addition, Grant was denied mission coordinator training allegedly because she was a woman and in retaliation for the 1987 suit.

In February 1989, Grant was placed on probation for ninety days for alleged misconduct. CAP failed to inform her of the charges against her prior to this notification. After her probation ended, Grant filed new complaints for verbal harassment which allegedly were never processed. Colonel Dale Hardy subsequently initiated proceedings to terminate Grant on two different occasions in late 1989. Pending the resolution of the latter proceeding, Grant was suspended from the New Hampshire Wing. Grant appealed that suspension to the Northeast Regional Appeal Board and the Board found in Grant's favor.

Grant alleges that the harassment and retaliation by Hardy and Colonel Alger Conger increased after her appeal succeeded.

3

She also claims that she filed several complaints which were not investigated, but rather were used as a basis for further disciplinary action against her.

In 1991, a similar series of events transpired whereby Grant was denied participation in mission flights and Hardy commenced another termination proceeding against her. This prompted Grant to file the present action.[3]

**B.    The Civil Air Patrol**

CAP is a volunteer civilian auxiliary of the United States Air Force and a private corporation created under federal law. See 36 U.S.C.A. § 201 et seq. (West 1988); accord S. Rep. No. 826, 96th Cong., 2d Sess., 1980, 1980 U.S.C.C.A.N. 2612 (CAP designated by Congress as official auxiliary of Air Force). Congress created CAP for the purpose of encouraging and developing interest in aviation, as well as to train and educate its members. 36 U.S.C.A. § 202. In addition, the Secretary of the Air Force is authorized to utilize CAP and its services to perform noncombat Air Force missions. 10 U.S.C.A. § 9441(c)

---

[3] Ultimately, CAP chose not to renew Grant's membership in CAP, and her membership ceased on June 30, 1991.

(West Supp. 1995).[4]  When CAP is called upon to perform an Air Force mission, federal law specifies that CAP is an instrumentality of the United States.  10 U.S.C.A. § 9441(c); <u>see also</u> <u>Williamson v. Sartain</u>, 555 F. Supp. 487, 490 (D. Mont. 1982) (in specific circumstance outlined in § 9441(c), CAP is instrumentality of United States and therefore covered under Federal Tort Claims Act).  Senior members of CAP are covered under the Federal Employees Compensation Act when performing noncombat missions for the Air Force.  5 U.S.C.A. § 8141 (West 1980 and Supp. 1995).  In addition, CAP has agreed to add the United States government as an insured party under all its corporate insurance provided that there is no additional cost to CAP.

Furthermore, the Secretary of the Air Force is authorized to allow CAP to utilize facilities and services of the Air Force; allow CAP to borrow aircraft, vehicles, communication equipment and necessary supplies; furnish fuel for missions carried out for the Air Force; establish and assign liaison officers of the Air

---

[4]  In 1986, Congress authorized funds for CAP from any surplus in the Department of Defense budget to allow CAP to engage in drug interdiction eradication missions at the direction of the Air Force.  <u>See</u> 10 U.S.C.A. § 9441 note (West Supp. 1995) (Historical and Statutory Notes).

Force to all levels of CAP headquarters; and furnish Air Force uniforms to cadets at no cost. 10 U.S.C.A. § 9441(b) (West 1959 and Supp. 1995); Air Force Regulations ("AFR") 46.6.

According to a Memorandum of Understanding between CAP and the Air Force ("MOU"), the "Air Force has an interest in aerospace education and training and therefore will continue its support of [CAP] education programs as currently outlined in regulations by providing access to facilities, services, and educational materials." Furthermore, CAP agreed in that memorandum to "continue to conduct the cadet program, encouraging CAP cadets to enter the Air Force and Air Force Academy." Finally, the Air Force agreed to give credit for some CAP training to those cadets with particular interests.

## 1. Membership and structure

CAP National Headquarters is located at Maxwell Air Force Base ("AFB"), Alabama and the entire organization consists of eight regions and fifty-two wings. Each wing is assigned two Air Force liaison officers. CAP is governed by the National Board and the National Executive Committee, each consisting of members of CAP as well as one Air Force officer who serves as CAP's Executive Director. CAP is headed by a civilian volunteer who holds the office of National Commander. The Secretary of the Air

6

Force appoints an Air Force officer to serve as CAP's Executive Director.[5] When acting as the Executive Director, the individual acts as a private person, not an Air Force officer, although he or she is there, in part, to protect the interests of the Air Force.[6] The Executive Director's position was created as a bridge between CAP and the Air Force, to justify Air Force support for CAP, and to "insure that the corporation is capable and is doing what the Air Force would have it do."

Policies adopted by either entity are translated into CAP regulations and issued by the Executive Director. The regulations are "published in an Air Force style," and signed by both the National Commander and Executive Director. These regulations govern all CAP activity. In addition, the Air Force has oversight responsibility for CAP's nondiscrimination program

---

[5] The Executive Director reports to Air University which is the professional military educational institution of the Air Force. Colonel Sampson in his deposition also acknowledged that he is at all times accountable to his superiors within the Air Force.

[6] General Miller, National Administrator of CAP, testified at his deposition that the Executive Director could not keep CAP from adopting a regulation which was adverse to Air Force interests. However, he then stated: "I think that he would find that the CAP probably would compromise with him because if they didn't cooperate, they might find their funding is not always there. . . ."

and in November 1991, the Executive Director recommended nondiscrimination training at all levels.  The Liaison Staff Handbook for Air Force Personnel states that any violation of the antidiscrimination policy, which is the Department of Defense directive on nondiscrimination applicable to CAP through CAP Regulation 19-1, should be immediately reported by the Air Force Liaison.

The National Administrator directs the day-to-day functions of the corporation, including running a store in an Air Force building in Texas and overseeing some membership duties. Although the Federal Bureau of Investigation conducts background checks on new members, CAP's corporate employees are all civilians.

Headquarters CAP-USAF ("HQ CAP-USAF") is located in the same facility on Maxwell AFB and is headed by the Executive Director. HQ-CAP-USAF is staffed by active duty military personnel and Department of Defense personnel.  According to the current National Commander, this entity ensures "that the Civil Air Patrol is capable of executing those Air Force missions which they would be assigned and are capable of performing the missions that are described for them in their charter."  The personnel director of HQ CAP-USAF is a Department of Defense civilian

8

employee.  Wing commanders are not under the direct authority of HQ CAP-USAF and are not removable by them for violation of CAP's regulations.  Training and education are controlled by the Air Force and conducted under the auspices of HQ CAP-USAF.

Activities at the wing level include staff meetings; cadet activities, such as orientation flights, drill practice, and academic work; and aerospace education.  The Air Force makes no personnel decisions at the wing level.  The wing commanders report to the region commanders who are all CAP volunteers. Complaints arising at the wing level are addressed by the wing commander and then are appealable to the regional commander.  No further review is allowed, although some investigations arising at the regional level will be addressed by the national office. Either the National Commander or the Executive Director may remove a member for failing to meet membership eligibility.

## 2. Funding

CAP receives substantial funding from the federal government.  By statute, the Secretary of the Air Force is authorized to pay travel expenses of CAP members in times of war or during national emergencies; provide funds for the national headquarters of CAP, including staff compensation and benefits; authorize payment for aircraft and vehicle maintenance; and

reimburse CAP for the purchase of major equipment. 10 U.S.C.A. §
9441(b). In addition, the Secretary of the Air Force, with
Department of Defense approval, may arrange for the use by CAP of
any military facilities and services necessary to carry out its
missions. Id. at § 9442 (West Supp. 1995). The MOU specifies
that funds appropriated by Congress "are used for Civil Air
Patrol Support in those areas deemed necessary by the Air Force."
Federal funds are also used to provide cadet uniforms. In
addition, the government reimburses CAP for fuel and lubricant
expenses of noncombat missions assigned by the Air Force. The
funds received through the Air Force amount to approximately $7
million, of which CAP's corporate budget amounts to approximately
$1.2 million. The former allocation is used to purchase specific
equipment and may not be used to purchase any other items. The
latter is given to the National Headquarters and is not dispersed
at the local level.

Furthermore, any Department of Defense property that is
acquired for CAP becomes CAP property.[7] However, prior to

---

[7] Unlike other federal agencies, CAP does not have to go
through the Defense Property Disposal Office to obtain Department
of Defense property. AFR 46.6. Liaison Air Force officers and
HQ CAP-USAF determine what property CAP needs. Id.

10

disposing of that property CAP must obtain the approval of HQ CAP-USAF. AFR 46.6. Violation of this regulation, or other misuse of Department of Defense funds or property will result in the suspension of Department of Defense funds or property to that CAP installation. Id.

CAP is required to report to Congress each year on its proceedings and activities for the preceding year and also deliver a report from an independent auditor. 36 U.S.C.A. § § 207, 1103 (West 1988) (accounting and auditing provision). That report is prepared by an Air Force officer in the Plans Division of HQ CAP-USAF. Furthermore, the CAP bylaws provide that the Air Force "may make such inspection of Civil Air Patrol activities as it may deem necessary to ensure that assistance furnished to the Corporation by the United States Air Force under the provisions of applicable statutes and regulations is being properly utilized." These inspections are done periodically by inspector generals who issue a written report to the head of HQ CAP-USAF. In some instances, the inspectors may place the wing on "logistics hold" thereby cutting off their Air Force support because the wing is unable to perform Air Force missions.

Funding at the wing level also consists of membership dues and donations. Dues are paid to CAP National Headquarters and a

portion is rebated to the wings for their use. The National Headquarters uses a portion of the dues collected to finance CAP's liability insurance covering non-Air Force assigned missions. Many expenses are borne by CAP members themselves. Some states provide appropriations to local wings for disaster relief services performed in the state and many wings hold fundraisers to defray additional costs.

### 3. Noncombat Missions for the Air Force

According to its legal counsel, "CAP performs approximately 85% of all air search and rescue missions for the country each year in addition to disaster relief missions for state and local governments." Search and rescue missions are reimbursed Air Force-assigned missions. Of the total 130,000 hours each year that CAP flies, approximately 40,000 of those hours are Air Force reimbursed missions. Reimbursed Air Force missions must be requested by the Air Force. CAP also flies Air Force-assigned missions which are not reimbursed.

Annual check flights in CAP aircraft are reimbursed Air Force-assigned missions. Training flights specifically conducted to train CAP aircrews to support any assigned Air Force mission, are nonreimbursed Air Force assigned missions. When flying these missions, however, the pilots are covered under the Federal

Employee Compensation Act as well as the Federal Torts Claims Act.

### 4. Symbols of CAP

Article III of the CAP Constitution provides that "[t]he corporate seal shall have inscribed thereon 'Civil Air Patrol - U.S. Air Force Auxiliary'. . . ." AFR 46.4 provides, however, that "distinctive emblems, buttons, insignia, and badges are employed to clearly identify the wearer as a member of CAP." In addition, the Air Force has complete authority over the design of the CAP uniform as well as the CAP general officer grade structure.

## DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine" issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

250 (1986); accord Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). A "material issue" is one that "affect[s] the outcome of the suit . . . ." Anderson, 477 U.S. at 248. The burden is upon the moving party to aver the lack of a genuine, material factual issue, Finn v. Consolidated Rail Corp., 782 F.2d 13, 15 (1st Cir. 1986), and the court must view the record in the light most favorable to the nonmovant, according the nonmovant all beneficial inferences discernable from the evidence, Oliver, 846 F.2d at 105. If a motion for summary judgment is properly supported, the burden shifts to the nonmovant to show that a genuine issue exists. Donovan v. Agnew, 712 F.2d 1509, 1516 (1st Cir. 1983). Where no reasonable jury could find for the nonmovant, even affording them all beneficial inferences, the motion must be granted. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993).

In cases such as this, where the ultimate issue presented by the motion for summary judgment involves a question of law, see, e.g., FTC v. Hospital Bd. of Directors, 38 F.3d 1184, 1187 (11th Cir. 1994), I will grant the motion unless it is based upon an erroneous legal theory or a genuine dispute exists concerning underlying facts that are material to the issue presented. See, e.g., Prokey v. Watkins, 942 F.2d 67, 73 (1st Cir. 1991). With

14

these principles in mind, I address defendants' claim that they are entitled to summary judgment because they are not governmental actors.

**B.    Governmental Action Requirement**

Grant alleges violations of the Fifth Amendment in Counts I and VIII, and violations of the First Amendment in Counts II and IX.  These provisions apply to actions of the federal government, not actions of private individuals or entities.  Edmonson v. Leesville Concrete Co., 500 U.S. 614, 619 (1991); Public Utils. Comm'n v. Pollack, 343 U.S. 451, 461 (1952).  Thus, under either constitutional provision, Grant must show that CAP's actions are the product of governmental action in order to prove her claim.

"Although the conduct of private parties lies beyond the Constitution's scope in most instances, governmental authority may dominate an activity to such an extent that its participants must be deemed to act with the authority of the government and, as a result, be subject to constitutional constraints." Edmonson, 500 U.S. at 620.  While the Supreme Court has observed that it is impossible to formulate an "infallible test" of governmental action, Reitman v. Mulkey, 387 U.S. 369, 378 (1967), the Court has developed certain tests, or principles to guide this highly fact-specific inquiry.  See generally, Gerena v.

15

Puerto Rico Legal Servs., 697 F.2d 447, 449 (1st Cir. 1983). Of these tests, the one which is most helpful in the present case is the "symbiotic relationship test."

The actions of a private entity are attributable to the federal government under the symbiotic relationship test if the government "has so far insinuated itself into a position of interdependence with [that entity] that it must be recognized as a joint participant in the challenged activity." Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961). See also, Air Line Pilots Ass'n, Int'l v. Dep't of Aviation, 45 F.3d 1144, 1149 (7th Cir. 1995) (using symbiotic relationship test to find that a private corporation engages in governmental actions by leasing advertising space in a city airport to other entities pursuant to a contract with the city). In such cases, the plaintiff does not have the burden of demonstrating the government's role in the challenged action because "the government is charged with all actions of the private party." Gerena, 697 F.2d at 451.

None of the courts employing the symbiotic relationship test have established a bright line clearly demarcating the barrier between purely private conduct on the one hand and purely governmental conduct on the other. E.g., Burton 365 U.S. at 725

16

(noting that "readily applicable formulae" not available);
Rodriquez-Garcia v. Davila, 904 F.2d 90, 98 (1st Cir. 1990)
(share in profits is not the exclusive factor in determining
whether symbiotic relationship exists). "Only by sifting facts
and weighing circumstances can the nonobvious involvement of the
[government] in private conduct be attributed its true
significance." Burton, 365 U.S. at 722. Several factors guide
this determination: (1) whether the entity performs a public
function; (2) whether the entity functions with substantial
autonomy; (3) the extent of the financial interdependence between
the government and the entity; (4) the extent of federal
regulation of the entity; (5) whether there are any mutual
benefits from the relationship; (6) the use, if any, of public
property, or other indicia of governmental presence, such as
badges, flags, or uniforms. See Burton, 365 U.S. at 723-24
(factors court found significant included lease in public
building as well as signs and flags indicating area was public
and run by the state); Romero v. Peterson, 930 F.2d 1502, 1507
(10th Cir. 1991) (on remand district court should consider
whether defendants were wearing federal agency uniforms or badges
in determining whether they were federal actors); Rodriquez-
Garcia, 904 F.2d at 99 (factors borrowed from Eleventh Amendment

17

jurisprudence on basis that entity sued is usually state created).  Although they are factors which should be considered, governmental regulation and federal funding are insufficient by themselves to create a relationship between the government and a private entity justifying the label of joint participants.  See Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350 (1974) (state regulated public utility not state actor); Rendell-Baker v. Kohn, 457 U.S. 830, 840 (1982) (school's receipt of public funds not sufficient to make school state actor); Blum v. Yaretsky, 457 U.S. 991, 1011 (1982) (nursing home's receipt of public funds not sufficient to make it state actor).

Applying these criteria, I conclude that CAP and the Air Force are sufficiently interdependent to qualify CAP as a governmental actor under the symbiotic relationship test.  First, CAP's principle mission is to assist the government in disaster relief, search and rescue, and drug interdiction missions.  These are activities which traditionally have been performed either primarily or exclusively by governmental entities.  As a result, when CAP is performing such activities, it has been deemed by Congress to be an instrumentality of the United States.  10 U.S.C.A. § 9441(c); see also Williamson, 555 F. Supp. at 490. Compare with San Francisco Arts & Athletics, Inc. v. United

18

<u>States Olympic Comm.</u>, 483 U.S. 522, 544-55 (1987) (Olympic Committee not a governmental actor in part because it performs a function previously performed by private entities) and <u>Rendell-Baker</u>, 457 U.S. at 841 (school analogous to other government contractors because relationship between school and teachers is no different because of state involvement).

Second, CAP's activities are tightly controlled by the Air Force. The MOU between CAP and the Air Force provides that should "difference[s] arise between [CAP] and the [Air Force] the resolution will be sought within the department of defense." Although the Air Force does not directly control all of CAP's day-to-day activities, the Secretary of the Air Force appoints CAP's Executive Director and the Director is a voting member of CAP's National Board and Executive Committee. The Air Force also exercises control over the enforcement of CAP's anti-discrimination policies, its cadet training and the disposition of CAP's equipment. Most significantly, the Air Force determines when and how CAP performs Air Force authorized search and rescue and drug interdiction activities.

Third, CAP is highly dependent on the government for financial and material support. The government provides CAP with most of its funding, the government allows CAP free use of an Air

19

Force base for its headquarters, and permits it to use other government properties for its bookstore and a printing plant. Most of CAP's equipment has been donated by the government. Finally, the government reimburses CAP for the fuel and maintenance costs resulting from 40,000 flight hours of the 130,000 hours CAP flies per year.

Fourth, CAP is highly regulated by the government. While CAP members are engaged in non-combat Air Force missions, they are deemed to be instrumentalities of the United States, and claims against CAP members that arise from such activities are subject to the Federal Tort Claims Act. In addition, when so engaged, these members gain the benefit of being covered under the Federal Employee Compensation Act. Finally, CAP's Air Force assigned missions are subject to various Air Force regulations and directives.

Finally, CAP and the Air Force are mutually dependant and each derives significant benefits from their close relationship. The Air Force requires CAP to provide qualified personnel who are capable of safely and effectively performing Air Force assigned missions. In describing the importance of such missions to the Air Force, a Congressional Committee reviewing the relationship between the two entities stated:

20

> An obvious question is what advantages accrue to the
> Government from the performance of Air Force-authorized
> missions by the Civil Air Patrol.  The slow-flying
> Civil Air Patrol aircraft are more suitable to search-
> and-rescue missions than are the faster military
> aircraft.  The lighter CAP aircraft are operated at a
> cost that is lower than comparable Air Force aircraft.
> The services of CAP personnel are voluntary and include
> the primary use of privately owned aircraft.  <u>Thus, to
> the extent that the Civil Air Patrol may be used in
> substitution for active-duty personnel, the Air Force
> is required to utilize less personnel and less
> equipment.</u>

H.R. Rep. No. 2539, 84th Cong., 2d Sess., 1956, 1956 U.S.C.C.A.N.
4299 (emphasis added).  In turn, CAP receives vital financial
support from the government.  Perhaps equally important, CAP's
members are allowed to participate the Air Force authorized
missions which serve as a principal reason for joining CAP.

In summary, while CAP is nominally a private corporation, it
performs essential government functions on behalf of the Air
Force, the Air Force exercises considerable control over its
activities and provides most of its funding, and CAP and the Air
Force are so interdependent that they can fairly be said to be in
a symbiotic relationship.  Accordingly, CAP and its members are
subject to the duties that the constitution imposes upon a
governmental actor and defendants' summary judgment motion must
be denied.

21

## CONCLUSION

The defendants' motions for summary judgment (document nos. 51 and 53) are denied.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

April 3, 1995
cc:  Jon Meyer, Esq.
     Theodore Wadleigh, Esq.

22