Dennis RICHARDS, Plaintiff,

v.

CITY OF LOWELL, Greater Lowell Workforce Investment Board, Greater Lowell Regional Employment Board, Inc., Henry Przydzial, Owen Michael McQuaid and John F. Cox, Defendants.

Civil Action No. 03–10705–RCL.

United States District Court,
D. Massachusetts.

Jan. 31, 2007.

David M. Cogliano, Gary M. Feldman, Davis Malm & D'Agostine P.C., Boston, MA, for Plaintiff.

Christine P. O'Connor, Kimberley A. McMahon, City of Lowell Law Department, Philip S. Nyman, Attorney at Law, Lowell, MA, Christopher J. Campbell, David J. Kerman, Jackson Lewis LLP, Robert P. Joy, Morgan, Brown & Joy, LLP, Mary Amanda Carlin, Pyle, Rome Lichten, Ehrenberg & Liss–Riordan, P.C., Boston, MA, for Defendants.

## ORDER

LINDSAY, District Judge.

The court grants the motions of the defendants for summary judgment on the ground that the plaintiff has not shown that he suffered retaliation in his employment because he engaged in constitutionally protected speech. As Magistrate Judge Dein determined, the statements at issue were not constitutionally protected because they were not made by the plaintiff merely as a citizen, speaking on matters of public concern, but were made pursuant to the plaintiff's official duties. *See Garcetti v. Ceballos*, —— U.S. ——, 126 S.Ct. 1951,

164 L.Ed.2d 689 (2006). The court also adopts Judge Dein's recommendation that the state law claims be dismissed, pursuant to 28 U.S.C. section 1367(c), without prejudice to their being raised in an appropriate Massachusetts state court. Although Judge Dein has comprehensively and ably addressed a number of other issues in her Report and Recommendation, this court finds it unnecessary to reach those issues in light of the ruling that the plaintiff has failed to demonstrate a constitutional violation. The clerk shall enter judgment for the defendants dismissing Count I of the First Amended Complaint with prejudice and dismissing all other counts of the complaint, pursuant to 28 U.S.C. section 1367(c), without prejudice to their being raised in an appropriate Massachusetts state court.

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

DEIN, United States Magistrate Judge.

### I. INTRODUCTION

In this action plaintiff Dennis Richards ("Richards") claims that he suffered adverse, retaliatory employment actions as a result of complaints that he made about the allegedly wrongful deposit and use of funds while he was employed as the Fiscal Manager of defendant Greater Lowell Workforce Investment Board ("GLWIB"). In addition to the GLWIB and its predecessor entity, the Greater Lowell Regional Employment Board, Inc. ("GLREB"), Richards has named as defendants his former supervisors, Henry Przydzial ("Przydzial") and Owen Michael McQuaid ("McQuaid"), as well as the City of Lowell, Massachusetts ("City"), and its City Manager, John F. Cox ("Cox"). Richards has sued the individual defendants in both their individual and official capacities.

Richards' First Amended Complaint contains five counts consisting of federal civil rights claims and state law claims. Specifically, Richards alleges, pursuant to 42 U.S.C. § 1983, that the GLWIB, the GLREB and the three individual defendants violated his rights under the First and Fourteenth Amendments to the United States Constitution by taking adverse employment actions against him in retaliation for his protected speech (Count I). Richards also alleges claims against the City, the GLWIB and the GLREB for violations of the Massachusetts Whistleblower Statute (Count II), against Przydzial, McQuaid and Cox for intentional interference with advantageous contractual relations (Count III), against the GLWIB and the GLREB for negligent supervision (Count IV), and against the GLWIB, the GLREB, Przydzial, McQuaid and Cox for violations of the Massachusetts Civil Rights Act (Count V).

The matter is presently before the court on the defendants' motions for summary judgment on all of Richards' claims (Docket Nos. 52, 55, 61 and 66). For the reasons detailed below, this court finds that each of the defendants is entitled to summary judgment with respect to Count I of the Amended Complaint. Although Richards has presented evidence to support a finding that the defendants acted under color of state law for purposes of his claim pursuant to 42 U.S.C. § 1983, this court concludes that Richards has failed to present sufficient facts to support a finding that his speech warranted protection under the First Amendment and that the defendants' alleged retaliatory acts violated his constitutional rights. Consequently, this court recommends to the District Judge to whom this case is assigned that

each of the motions for summary judgment be ALLOWED with respect to Count I.[1] Furthermore, because summary judgment in favor of the defendants on Count I will leave only state claims over which the court lacks original jurisdiction, this court also recommends that Richards' state law claims be dismissed.

## II. STATEMENT OF FACTS [2]

The following material facts are undisputed unless otherwise indicated.[3]

### The Parties

The defendant GLWIB is an agency that was created pursuant to the Workforce Investment Act of 1998, 29 U.S.C. §§ 2801

1. Although Richards did not name the City as a defendant with respect to Count I, he asserts that at all relevant times, the GLWIB and the GLREB were City agencies and defendants Przydzial and McQuaid, like defendant Cox, were City employees. (Pl.'s Opp. to City's Mem. (Docket No. 85) at 1). Accordingly, Richards is seeking to hold the City liable for the conduct of these defendants, and the City has filed a motion for summary judgment addressing Richards' federal claim.

2. The facts are derived from the following materials: (1) Statement of Undisputed Facts Pursuant to Local Rule 56.1 set forth in the Motion of Defendants Greater Lowell Workforce Investment Board and Michael McQuaid for Summary Judgment (Docket No. 55) ("GLWIB SOF"); (2) Exhibits attached to the Declaration of Christopher J. Campbell (Docket No. 59) ("GLWIB Ex. __"); (3) Declaration of Owen Michael McQuaid (Docket No. 58) ("McQuaid Aff."); (4) Supplemental Declaration of Owen Michael McQuaid attached to the Reply Memorandum of Defendants Greater Lowell Workforce Investment Board ("GLWIB") and Owen Michael McQuaid (Docket No. 104) ("McQuaid Supp. Aff."); (5) Defendant City of Lowell's Amended Statement of Facts (Docket No. 75) ("CF"); (6) Attachments to the List of Exhibits Attached to Defendant City of Lowell's Motion for Summary Judgment (Docket No. 53–2) ("City Ex. __"); (7) Defendant City of Lowell's Statement of Additional Facts for its Reply Brief (Docket No. 106–2) ("CAF"); (8) Attachments to the Defendant City of Lowell's Exhibit List for Reply Brief (Docket No. 95) ("City Supp. Ex. __"); (9) Defendant Henry Przydzial's Statement of Undisputed Facts (Docket No. 62–2) ("PF"); (10) Appendix to Defendant Henry Przydzial's Statement of Undisputed Material Facts (Docket No. 62) ("Przydzial App."); (11) Plaintiff Dennis Richards' Statement of Disputed and Undisputed Facts Submitted in Opposition to Defendants' Motions for Summary Judgment (Docket No. 82) ("RF"); (12) Exhibits attached to the Affidavit of David M. Cogliano in Support of Plaintiff Dennis Richards Statement of Disputed and Undisputed Facts Submitted in Opposition to Defendants' Motions for Summary Judgment (Docket Nos. 86 and 87) ("Pl.'s Ex. __"); and (13) Affidavit of William Tanda (Docket No. 109–2) ("Tanda Aff.").

3. Przydzial urges the court to accept as true the facts asserted in his statement of undisputed facts on the grounds that the plaintiff has failed to comply with Local Rule 56.1. In particular, Przydzial argues that "[i]nstead of filing a concise statement demonstrating what he believes to be the genuine, disputed facts, plaintiff filed a 38 page, 194 paragraph document" that "leave[s] to this Court the unenviable burden of ferreting through his 38 pages" to determine what issues are in dispute. (Przydzial Reply Mem. (Docket No. 105) at 2). This court denies Przydzial's request to find the facts based solely on technical grounds. Richards' Statement of Disputed and Undisputed Facts does not clearly violate Local Rule 56.1, which provides in relevant part that "[o]pposition to motions for summary judgment shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation." The Rule does not dictate a particular format that an opposing party must follow in order to demonstrate which asserted facts are in dispute. Moreover, in his Statement, Richards has responded not only to Przydzial's 151 paragraphs of asserted facts, but also to the numerous facts asserted by the City, the GLWIB and McQuaid. In doing so, the plaintiff has provided appropriate support for each of the factual statements asserted. Accordingly, this court has assumed the challenging task of presenting a fair description of the relevant material facts and the genuine issues in dispute.

*et seq.* ("WIA"), as part of a national workforce preparation and employment system established to meet the needs of businesses, job seekers and those wishing to further their careers by providing workforce investment activities designed to increase the employment, retention and earnings of participants, as well as the attainment of occupational skills by participants.[4] (GLWIB SOF ¶ 1; PF ¶ 1; CF ¶ 4). The GLWIB designs and implements employment programs for businesses and individuals living in the Greater Lowell, Massachusetts area, and enters into contracts with state and federal agencies to provide services to its target population. (GLWIB SOF ¶¶ 1, 6). It derives its operating revenue, in substantial part, from state and federal grants that are earmarked to assist certain economically disadvantaged adults, dislocated workers and low-income youth. (GLWIB SOF ¶ 6; RF ¶ 1). Specifically, the GLWIB tracks expenditures incurred in providing services and then, in a process known as "drawing down" funds, requests reimbursement from the appropriate state and federal agencies. (GLWIB SOF ¶ 6). The GLWIB also receives compensation for meeting certain objectives pursuant to performance based contracts, and for providing services as a subcontractor to other Workforce Investment Boards. (GLWIB SOF ¶¶ 7, 8).

At all times relevant to this action, the GLWIB was overseen by a Board of Directors ("Board") comprised of individuals who were appointed by the City Manager and consisted mostly of business representatives, but also of representatives of education providers, labor organizations, community-based organizations and economic development agencies. (GLWIB SOF ¶ 2; PF ¶ 9). The Board was responsible for appointing the GLWIB's Executive Director, who reported to the Board, but otherwise was not involved in the GLWIB's personnel decisions. (GLWIB SOF ¶ 3).

During the relevant time period and until his termination on May 2, 2003, plaintiff Richards was employed, as an at-will employee, as the Fiscal Manager of the GLWIB and its predecessor organizations. (*Id.* ¶ 15; PF ¶¶ 5, 13; RF ¶ 18). Defendant Przydzial served as the Executive Director of the GLWIB until he resigned on December 23, 2002. (PF ¶ 2; GLWIB SOF ¶ 4). He also was Richards' direct supervisor during the time period from 1996 to December 2002. (RF ¶ 33). Defendant McQuaid was the Deputy Director of the GLWIB and also was supervised by Przydzial until Przydzial resigned, at which time McQuaid was named as the agency's Acting Executive Director. (PF ¶¶ 3,4; RF ¶¶ 36, 37). McQuaid then was appointed as the GLWIB's Executive Director, and served in that position from approximately April 2003 to July 1, 2003. (McQuaid Aff. ¶ 1). He supervised Richards during the time period from December 23, 2002 until Richards' termination on May 2, 2003. (CF ¶ 17).

The defendant City is the municipal government of the City of Lowell, Middlesex County, Massachusetts. (PF ¶ 6). It is ultimately responsible for any grant money that is given to the GLWIB. (RF ¶ 7). At

---

4. Richards has named both the GLWIB and one of its predecessors, the GLREB, as defendants in this action. The GLREB was renamed the GLWIB in about the late 1990s, in connection with the Workforce Investment Act of 1998, which superseded the prior enabling legislation, the Job Partnership Training Act, 29 U.S.C. § 1501 et seq. (GLWIB SOF at n. 1). For purposes of the present motions, the parties have used the term "GLWIB" to refer to the GLWIB and its predecessor entities, including the GLREB, and this court will do the same. (*Id.*).

all relevant times, defendant Cox was the City Manager and was responsible for running the day-to-day operations of the City, including the hiring of all City employees and the approval of employee terminations by the City. (PF ¶ 7; RF ¶¶ 38, 39). Cox also was the lead official in the local area for purposes of the WIA. (PF ¶ 8). In that capacity, Cox was responsible for appointing the members of the GLWIB's Board. (*Id.* ¶ 9; RF ¶ 4).

### The GLWIB's Relationship to the City

At issue in this case is whether the GLWIB and its predecessors were private entities or municipal agencies, and whether the employees of the GLWIB and its predecessors were City employees. In 1977, Richards was hired as a Comprehensive Employment Training Act ("CETA")[5] participant to work as a Legal Aide in the Law Department. (RF ¶ 16; CF ¶ 11; City Ex. 7B). The then City Manager approved Richards' employment. (City Ex. 7B). CETA was a predecessor to the GLWIB, and Richards' position constituted a public service job that had been made available through federal funding. (City Exs. 7A, 7B). Effective December 11, 1978, the CETA Administrator had Richards transferred from Public Service Employment to "CETA Administration Title I" and assigned to the position of Account Analyst. (CF ¶ 11; City Ex. 7D). Again, the City Manager approved Richards' assignment. (City Ex. 7D).

Richards contends that at the time of his transfer, CETA was a City department and he became a City employee. (RF

¶ 16). However, the City vigorously disputes both of these assertions. The City relies on the undisputed fact that in 1943, when the City adopted the Plan E form of government, it possessed no CETA, Office of Employment Training, Private Industry Council, GLREB, GLWIB or Career Center departments or offices, and that, prior to June 25, 2003, the City had never passed an ordinance establishing any such departments or offices. (CF ¶¶ 1, 2, 3). Under Massachusetts law, cities having a Plan E form of government could only establish new departments by ordinance upon a vote of the city council or other legislative body. (CF ¶¶ 1, 2; City Ex. 1). As detailed below, however, this fact is not determinative in assessing whether there is state action sufficient to support Richards' federal claims.

Richards received medical benefits through the City while working for CETA Administration. (City Ex. 12 at 62). However, he was not entitled to participate in the City's contributory retirement system until 1989. (CF ¶ 19). Richards was aware that "regular City employees" were automatically eligible for participation in the system. (*Id.*).

Over time, CETA evolved into the Private Industries Council, which was registered as a charitable corporation with the Secretary of State for the Commonwealth of Massachusetts. (RF ¶ 17; CF ¶ 12; City Ex. 3 at 4). That organization eventually became the GLREB, which then became the GLWIB. (RF ¶ 17; CF ¶ 12).

---

**5.** "Before its repeal in 1982, CETA provided for grants of federal funds to certain qualified entities known as 'prime sponsors,' principally state and local governments, for programs 'provid[ing] job training and employment opportunities for economically disadvantaged, unemployed, or underemployed persons[.]' " *Brock v. Pierce County*, 476 U.S. 253, 255, 106 S.Ct. 1834, 1836, 90 L.Ed.2d 248 (1986)

(quoting 29 U.S.C. § 801 (1976 ed., Supp. V)) (initial alteration in original). CETA was replaced by the Job Training Partnership Act effective October 13, 1982. *Id.* at 255 n. 1, 106 S.Ct. at 1836 n. 1. The Job Training Partnership Act was the statutory predecessor of the WIA. *Narragansett Indian Tribe of R.I. v. Chao*, 248 F.Supp.2d 48, 50 n. 1 (D.R.I. 2003).

Richards was the Fiscal Manager for the GLWIB, as well as for its predecessor organizations. (RF ¶ 18). In that capacity, Richards was responsible for the proper classification, accounting and reporting of federal and state grant funds received by the GLWIB, for "drawing down" grant funds owed to the GLWIB, and for implementing a cost allocation·plan and managing a cash management system designed to ensure compliance with federal regulations. (*Id.* ¶¶ 19, 139; GLWIB SOF ¶ 16). He also maintained accounting records, reports and supporting documentation required for the annual audit and periodic reviews of the GLWIB by state agencies, and assisted the independent auditors and State monitors during audits. (RF ¶ 19). The GLWIB's operating account, which Richards was responsible for maintaining as part of his duties, was a City account. (RF ¶ 20; GLWIB Ex. C at 66).

Between 1983 and 1996, Richards also performed work for the City Auditor. (RF ¶ 22). During that time, Richards reported to both the City Auditor and Przydzial, and was on the City Auditor's payroll. (*Id.* ¶¶ 22, 23; Pl.'s Ex. C at 103). Additionally, although the GLWIB's offices were located at 206 Jackson Street and then at 107 Merrimack Street in Lowell, Richards worked in the City Auditor's Office for many years and then in the basement of City Hall. (RF ¶¶ 21, 24).

### The 1993 Agreement Between the City and the GLWIB

In 1993, the GLWIB and the City entered into a Memorandum of Agreement ("MOA") in order to carry out the purposes of the Job Training Partnership Act ("JTPA"), the statutory predecessor of the WIA, and to "formally define the understanding" between the GLWIB and the City Manager. (City Ex. 6 at 1). Pursuant to the MOA, the City was designated as the grant recipient with ultimate responsibility for state and federal grant funds received from the United States Secretary of Labor through the Commonwealth of Massachusetts. (*Id.* at 1–2). The GLWIB agreed, among other things, to serve as the administrative agency with responsibility for the administrative and operational implementation of a job training plan, including the utilization and allocation of the grant funds, within the Greater Lowell area. (*Id.* at 3). Significantly, the MOA provided that "the authority for hiring and firing staff will rest with the [GLWIB]. All staff will be subject to personnel policies and practices approved by the [GLWIB]." (*Id.; see also* CF ¶ 10). However, nothing in the MOA specifically addressed whether the parties viewed the GLWIB as a City agency or a private entity.

The evidence shows that the relationship between the City and the GLWIB remained unclear following the execution of the MOA. According to the defendants, GLWIB employees, including Richards, received their salaries and any approvals for merit raises or pay increases from the GLWIB, and were included in the GLWIB's rather than the City's budget. (McQuaid Aff. ¶ 4; GLWIB SOF ¶ 15; GLWIB Ex. E at 94–95; CF ¶ 51). However, according to Richards, after the MOA, he continued to provide accounting and some payroll assistance to the City Auditor, to receive paychecks, medical benefits and workers' compensation coverage from the City, and to receive overtime pay from the City for extra work that he performed, which was unrelated to his work at the GLWIB. (RF ¶¶ 23, 28; Pl.'s Ex. D at 84–85; Pl.'s Ex. E at 21; Pl.'s Ex. K ¶ 7). Moreover, GLWIB employees continued to contribute to the City retirement ·system and, when Richards' supervisor Przydzial left GLWIB, his February 2003 application for unemployment insur-

ance identified the City as his employer. (RF ¶ 28; Pl.'s Ex. MM).

The July 1, 2000 version of the GLWIB's Personnel Policy Handbook describes the GLWIB as a department of the City. In particular, it provides that the "GLWIB as a Department of the City of Lowell is covered for work related injuries through the City of Lowell Workers' Compensation Policy." (RF ¶ 8 (quoting Pl.'s Ex. AA at Bates # DEF002036)). It also contains, *inter alia*, the City's sexual harassment policy, the City's guidelines for children, family and friends in the workplace, and the City's drug and alcohol policy, which states that "[a]s a condition of continued employment with the City, all employees must abide by the terms of this policy." (Pl.'s Ex. AA at Bates # DEF002028). Also consistent with Richards' argument that the GLWIB was a City agency was the fact that the City's independent auditors included the GLWIB as part of the City's single audit. (RF ¶ 9). The City also assigned to GLWIB employees access codes and passwords necessary to access financial information in the GLWIB or City database. (Pl.'s Ex. LL at 11). Furthermore, the City leased the premises at 107 Merrimack Street where the GLWIB maintained its principal place of business. (RF ¶ 11; CF ¶ 7).

However, the record also contains evidence supporting the defendants' contention that the GLWIB operated as a private entity following the execution of the MOA. For example, but without limitation, on about November 28, 2001, Richards wrote an e-mail in which he stated, "technically I am not a city employee." (CF ¶ 15). Additionally, Richards authored a memorandum, dated March 27, 2002, which reads: "[t]he Greater Lowell Workforce Investment Board (GLWIB) and the former Greater Lowell Regional Employment Board (GLREB) has operated as a private

non-profit entity for years." (City Ex. 16 at 3).

In any event, the record indicates that the MOA did not clearly define the respective roles of the City and the GLWIB in carrying out the purposes of the WIA. In a letter dated December 16, 2002, the Massachusetts Department of Labor and Workforce Development requested that Cox, in his capacity as the Chief Elected Official for the GLWIB, provide clarification "regarding the Greater Lowell Workforce Investment Area workforce development organizational, reporting and financial structure." (RF ¶ 12; Pl.'s Ex. NN). In particular, the Commonwealth noted that the resolution of administrative issues "has been hampered by the current organizational and decision-making structure at the GLWIB and its unclear relationship with the City of Lowell" and that "[s]ignificant confusion continues to exist due to a lack of differentiation between the responsibilities of the City of Lowell, the GLREB, and the Office of Employment and Training (DET) and the GLWIB." (Pl.'s Ex. NN).

The apparent confusion regarding the GLWIB's relationship to the City appears to have been finally resolved in 2003, after the events at issue in this case. In that year, the City Council voted to pass an ordinance establishing a Career Center of Lowell Division of the City Manager's Office and making the GLWIB an official department of the City effective July 2003. (RF ¶ 15; Pl.'s Ex. G at 170–71; City Ex. 4).

### The 501(c)(3) Account

The events that ultimately gave rise to Richards' claims were precipitated by Przydzial's allegedly improper decision to deposit certain funds received by the GLWIB into a special bank account. The account, which the GLWIB had established in the late 1970s, was separate from

the operating account maintained by Richards during his employment as Fiscal Manager. (RF ¶ 47; GLWIB SOF ¶ 9). It was designated as a Section 501(c)(3) charitable account (the "501(c)(3) Account"), and was originally intended to hold funds to be used for a daycare center. (RF ¶ 47). Unlike the GLWIB's operating account, the 501(c)(3) Account was not a City account. (Pl.'s Ex. E at 66; GLWIB SOF ¶ 9). Rather, during the relevant time period, it was maintained by Przydzial and a staff member named Barbara O'Neil, and the only signatories to the account were Przydzial and Bonnie Posnak, a member of the Board. (RF ¶ 48; Pl.'s Ex. E at 66–68). Richards performed no accounting functions or other job responsibilities with respect to the 501(c)(3) Account and Przydzial repeatedly told Richards that the Account was none of his business. (RF ¶ 49; PF ¶¶ 25, 26). The 501(c)(3) Account largely remained dormant until 1998. (RF ¶ 50).

### The Norwood Contract

In 2001, Przydzial determined that certain funds received by the GLWIB pursuant to an agreement for services between the GLWIB and the Metro Southwest Service Delivery Area (the "Norwood Contract") should be put into the 501(c)(3) Account. The Norwood Contract provided that Metro Southwest would reimburse the GLWIB for workforce services that the GLWIB afforded to participants who lived in the Lowell area, but had been laid off by employers in the Metro Southwest area. (RF ¶ 51). In January 2001, Richards, in his capacity as Fiscal Manager for the GLWIB, received a payment of $18,500 from Metro Southwest pursuant to the Norwood Contract. (Id. ¶ 52; PF ¶ 15).

Because Richards had not been informed about the Norwood Contract, he made inquiries regarding the purpose of the check and the appropriate disposition

of the funds. (RF ¶¶ 51, 52; Pl.'s Ex. W). He was directed to send the money to the Career Center, a component of the GLWIB, which he did. (PF ¶ 18; Pl.'s Ex. W). On that same day, Przydzial, who was out of town, contacted Richards and informed him that the money represented a fee for service rather than federal money, and that he was going to deposit it into the 501(c)(3) Account. (Pl.'s Ex. W; PF ¶¶ 19, 20; GLWIB SOF ¶ 12).

Richards disagreed with Przydzial as to the appropriate disposition of proceeds from the Norwood Contract. (RF ¶ 52; PF ¶ 21). Specifically, Richards believed, based on his experience, that the money was federal program income that should have been deposited into the GLWIB's operating account. (RF ¶ 54; PF ¶ 21; Przydzial App. at 20). However, Richards later agreed that there could be differences of opinion as to whether payments made to the GLWIB under the Norwood Contract were federal funds. (PF ¶ 22).

In April 2001, Richards received a second payment pursuant to the Norwood Contract in the amount of $11,000. (RF ¶ 55; PF ¶ 27). Although Richards continued to believe that the money from the Norwood Contract should have been deposited into the GLWIB's operating account, he forwarded the money to the Career Center for deposit into the 501(c)(3) Account. (RF ¶¶ 55, 56; PF ¶ 28). According to Richards, Przydzial continued to tell him that the 501(c)(3) Account was none of his business, and he feared that he would be fired if he continued to make it an issue. (Przydzial App. at 166).

### The Investigation of the 501(c)(3) Account

Richards remained concerned that the GLWIB was mishandling the proceeds of the Norwood Contract. (RF ¶ 58). Accordingly, despite his fears about his employment security, Richards spoke with

Elizabeth Durkin, an employee of the Commonwealth Corporation ("CommCorp"), about the deposit of funds into the 501(c)(3) Account. (*Id.;* PF ¶¶ 32, 33). CommCorp was the state agency responsible for overseeing the use of federal funds received by the GLWIB and other Workforce Investment Boards. (GLWIB SOF ¶ 10; PF ¶ 30). It performed periodic monitoring of the GLWIB's revenue and expenditures to ensure that the agency was handling funds from federal grants properly. (GLWIB SOF ¶ 10; PF ¶ 31). In July 2001, following Richards' discussion with Ms. Durkin, CommCorp initiated an investigation regarding the deposit of funds into the 501(c)(3) Account. (RF ¶¶ 59, 61; GLWIB SOF ¶ 12; PF ¶ 35). Initially, the investigation concerned only the proceeds of the Norwood Contract. (RF ¶ 60). However, it was later expanded to include an examination of other deposits as well. (GLWIB SOF ¶ 14).

Przydzial had no knowledge of CommCorp's intention to conduct an investigation until July 25, 2001, when CommCorp monitors arrived at the GLWIB to commence the investigation. (PF ¶¶ 35–43; RF ¶ 61). However, he had been aware, in about May 2001, that Richards had contacted the Metro Southwest Service Delivery Area regarding the Norwood Contract and that CommCorp might review the program. (RF ¶ 59; Pl.'s Ex. E at 90–91, 175–76).

According to Richards, Przydzial refused to cooperate with the CommCorp monitors, became angry at Richards, and threatened him by saying, "if I find out you had anything to do with this...." (RF ¶¶ 61–62). Przydzial does not deny making the statement, but claims that he was upset at Richards for not informing him of CommCorp's visit and leaving him unprepared to provide the monitors with relevant documents. (PF ¶¶ 43–48).

Following its initial investigation of the GLWIB, CommCorp issued a finding that the funds from the Norwood Contract were federal funds and should have been deposited into the GLWIB's operating account. (GLWIB SOF ¶ 13). In September 2001, Przydzial agreed to pay CommCorp $77,000, the total amount that the GLWIB had received from the Norwood Contract, in order to resolve the finding. (*Id.;* RF ¶ 63; PF ¶¶ 49, 51). However, in November 2001, before any payment had been made, CommCorp expanded its investigation of the 501(c)(3) Account. (GLWIB SOF ¶ 14; PF ¶ 52). Przydzial knew that Richards was responsible for raising the issues that caused CommCorp to expand the investigation. (RF ¶ 66). Przydzial spoke with Cox, as well as Kevin Coughlin, the Chairman of the Board, about the investigation. (RF ¶¶ 5, 67).

### The Order to Remain Out of City Hall

At issue in this case is whether the defendants took retaliatory actions against Richards as a result of his contacts with CommCorp and others regarding the 501(c)(3) Account. In the Fall of 2001, just after CommCorp notified Mr. Coughlin, Przydzial and Cox that its investigation of the 501(c)(3) Account would be expanding, Przydzial ordered Richards to stay out of City Hall, and informed Richards that he would risk losing his job if he failed to comply. (PF ¶¶ 70, 71; RF ¶¶ 68, 72). Przydzial gave Richards the order to remain out of City Hall after Cox told Przydzial that Richards' presence there was disruptive and he didn't understand why Richards needed to be there. (PF ¶¶ 69, 70; GLWIB SOF ¶ 22; CF ¶ 33). Richards believed that Przydzial's only motive for keeping Richards out of City Hall was that Cox had directed him to do so. (PF ¶ 73; Przydzial App. at 40). Several days after Richards received Przydzial's order, McQuaid, whom Richards had considered a

friend, reiterated to Richards that he should stay out of City Hall and that his failure to do so would put his job at risk. (RF ¶ 71; Przydzial App. at 38–39). Richards believed that McQuaid spoke to him at Przydzial's request and was not motivated by any "ill will." (GLWIB SOF ¶ 23; GLWIB Ex. A at 2–77–2–78).

The defendants assert that the decision to ban Richards from City Hall was not made in retaliation for his communications with CommCorp, but was due to his disruptive behavior at City Hall. The record shows that between 1996 and the first week of July 2001, Richards' office was located in the basement of City Hall. (PF ¶¶ 56, 57; CF ¶ 26). Prior to the end of June 2001, Cox received numerous complaints from employees in the City Auditor's office that Richards was coming to their office and disrupting their work. (PF ¶¶ 61, 62; CF ¶ 22; GLWIB SOF ¶ 18). Other City Hall employees complained to Cox about Richards' behavior as well. (CF ¶¶ 21, 23). Cox communicated with Przydzial about the problem, and at the end of June 2001, Przydzial instructed Richards to move his office out of City Hall and into the GLWIB's headquarters. (CF ¶¶ 24, 25; PF ¶¶ 58–60). Richards does not agree that he engaged in disruptive behavior, but he does concede that the transfer of his office to the GLWIB's headquarters was unrelated to the CommCorp investigation. (RF ¶¶ 68, 69; PF ¶ 65; GLWIB SOF ¶ 19).

After Richards' office was relocated, he continued to visit City Hall about three times a week even though his job duties did not require it. (PF ¶¶ 66, 67; CF ¶¶ 28, 30; GLWIB SOF ¶ 21). Cox claims that he continued to receive complaints about Richards' disruptive behavior there, although he did not observe the offending behavior first hand and does not remember precisely who made the complaints.

(PF ¶ 68; GLWIB SOF ¶ 21; RF ¶ 68). Cox expressed concern to Przydzial, and Przydzial gave Richards the order to stay out of City Hall. (PF ¶¶ 69, 70).

Following Przydzial's order, Richards was only able to go to City Hall if he first obtained permission, even if he was working on City business. (RF ¶ 74). Przydzial did not deny any of Richards' requests for permission. (PF ¶ 75).

### The Continuing Investigation of Deposits into the 501(c)(3) Account

The CommCorp investigation continued into 2002. In January 2002, CommCorp notified the GLWIB and Przydzial that it was not satisfied with the GLWIB's response to its investigation, that the investigation would continue, and that CommCorp was now reviewing a total of $226,500 in funds. (RF ¶ 76). Also at about that time, the Executive Committee of the GLWIB Board had become concerned about the status of the investigation and the press coverage it was receiving, and Przydzial was becoming concerned about his job security. (*Id.* ¶¶ 77–79). In April 2002, CommCorp made an Initial Determination in which it concluded that the GLWIB had mishandled $226,500 in funds by depositing funds from the Norwood Contract, as well as certain rental income and fees, into the 501(c)(3) Account. (*Id.* ¶ 80). Cox became concerned that the City would become responsible for any payments required as a result of the investigation, and Przydzial assured Cox that "under no circumstances" would the City have responsibility for any such payments. (*Id.* ¶ 81).

The Federal Bureau of Investigation ("FBI") and the United States Department of Labor also conducted investigations of the 501(c)(3) Account in 2002. (*Id.* ¶ 88; PF ¶ 77). In connection with its investigation, the FBI contacted and met with Rich-

ards, issued subpoenas to the GLWIB and the City, and interviewed Przydzial on four or five occasions. (RF ¶¶ 88–90; Pl.'s Ex. F at 236–37). Although Richards kept quiet about his meetings with the FBI, Przydzial suspected that Richards "had a hand" in the FBI investigation. (PF ¶ 79; RF ¶ 89; Pl.'s Ex. F at 332).

On the same day that Richards met with the FBI, he also attended a meeting with McQuaid. (RF ¶ 91). According to Richards, during the meeting, he admitted to McQuaid that he had gone to CommCorp when he suspected that funds had been mishandled, and McQuaid responded by saying that he thought Richards had gone to CommCorp. (*Id.* ¶¶ 91–92; PF ¶¶ 101–02). McQuaid agreed that reporting suspected financial improprieties was within the scope of Richards' responsibilities as Fiscal Manager of the GLWIB. (RF ¶ 93).

### *Richards' Suspension*

In the Spring of 2002, Przydzial gave Richards a two week suspension from his job at the GLWIB following his appearance at a meeting of the Finance Subcommittee of the City Council ("Subcommittee"). The parties dispute whether comments made by Richards which led to his suspension are constitutionally protected.

On May 7, 2002, the Subcommittee held a meeting to address its concerns about the status and resolution of the CommCorp investigation. (RF ¶ 84; PF ¶ 80; GLWIB SOF ¶ 25). Among those attending the meeting were four City Councilors, the Mayor, Cox, two Assistant City Managers, the City Solicitor, a newspaper reporter, Przydzial and Richards. (PF ¶ 81; GLWIB SOF ¶ 25). Richards attended the meeting, not as a representative of the GLWIB, but to keep abreast of developments in the CommCorp investigation. (GLWIB SOF ¶ 25; PF ¶ 82). Representatives from CommCorp also were sched-

uled to attend the meeting, but no one from that organization was present when the meeting began. (PF ¶¶ 83, 84).

Richards believed, based on a discussion with a CommCorp employee, that Przydzial had told CommCorp not to send its monitors to the meeting. (RF ¶ 85). Consequently, when the Subcommittee Chairman noted that no one from CommCorp was present at the meeting, Richards announced that "a city official had called Commonwealth Corporation and requested that the monitors not attend the meeting." (CF ¶ 38 (quoting City Ex. 15); *see also* PF ¶¶ 87–88; RF ¶ 86). Cox asked Richards to identify the official, and Richards replied that it was Przydzial. (City Ex. 15; PF ¶¶ 89, 90; RF ¶ 86). Richards claims that he did not intend to embarrass anyone, but that he made the statement because he "knew the CommCorp Investigation was a matter of public interest and he felt that it was important to inform people that CommCorp was told not to come to the meeting because that addressed the status of the Investigation." (RF ¶ 87).

Richards agrees that he had no first hand knowledge regarding Przydzial's alleged discussion with CommCorp, and Przydzial claims that in fact, he never contacted CommCorp regarding its attendance at the meeting. (City Ex. 10 at 148–50; PF ¶¶ 94, 95; CF ¶ 40; GLWIB SOF ¶ 28). Rather, according to Przydzial, the President of CommCorp had called Przydzial to inform him that Paul Niedzwicki, the Chief Legal Counsel and Vice President of CommCorp, would be attending the meeting. (PF ¶¶ 91, 93; GLWIB SOF ¶ 28). In fact, Niedzwicki did attend the meeting shortly after Richards made his statement. (PF ¶ 91; GLWIB SOF ¶ 27). Nevertheless, Richards stated, at the conclusion of the meeting, that he stood by his earlier statement. (PF ¶ 92).

Przydzial believed that Richards' statements were false and embarrassing to both him and the GLWIB. (PF ¶ 107). After consulting with the GLWIB's Counsel and its Chairman of the Board, Przydzial decided to suspend Richards for two weeks without pay based on his conduct at the Subcommittee meeting. (PF ¶¶ 106, 108; RF ¶ 95). Neither Cox nor McQuaid participated in the decision to suspend Richards. (CF ¶¶ 43, 44; GLWIB SOF ¶ 29).

### Changes to Richards' Working Environment

The parties also dispute whether Przydzial's treatment of Richards subsequent to the suspension constituted retaliatory action for Richards' whistleblowing activities. While Richards was out on suspension, the GLWIB copied Richards' computer files. (RF ¶ 101). Additionally, when Richards returned to the GLWIB on June 10, 2002, his desk and computer had been moved out of his office and into a cubicle in front of Przydzial's office. (RF ¶ 102; PF ¶ 115). Richards was allowed to return to his office in order to access records, but Przydzial required that the office door remain open when Richards was in there. (RF ¶ 110; PF ¶¶ 121, 122). Przydzial claimed that he had moved Richards out of his office in order to keep him in "the mainstream" so that he could keep an eye on him and because Richards had been using his cell phone and holding closed door meetings in his office with the City Auditor. (RF ¶¶ 103, 104; PF ¶ 118). However, Przydzial conceded that he never heard Richards' cell phone, was not aware of the substance of discussions between Richards and the City Auditor, and could not recall any work assignments that Richards had failed to complete. (RF ¶¶ 104, 105). Moreover, Przydzial admitted that he was upset with Richards because of what had happened at the Subcommittee meeting and because the

CommCorp investigation "was a problem that shouldn't have ... blossomed into what it did." (RF ¶ 108; Pl.'s Ex. E at 197).

The CommCorp investigation continued throughout the Summer of 2002, and Richards continued to provide information to CommCorp, the press, the FBI and others. (RF ¶¶ 114, 122; GLWIB SOF ¶ 33). CommCorp remained dissatisfied with the GLWIB's responses to requests for information, and the Board of the GLWIB was becoming concerned with the length of the investigation and with Przydzial's inability to resolve the matter. (RF ¶¶ 114, 115; GLWIB SOF ¶ 32; Pl.'s Exs. PP and XX). In September 2002, the Executive Committee of the GLWIB Board held a meeting at which frustration was expressed regarding the continuing investigation. (RF ¶ 116). On September 27, 2002, soon after the Executive Committee meeting, Przydzial issued a written directive to Richards instructing him not to leave the GLWIB's offices during the work day, except to go to lunch, without Przydzial's approval. (RF ¶ 117; PF ¶ 126). Przydzial claims that the directive was triggered by the fact that Richards was not complying with his earlier instruction to stay out of City Hall during working hours. (PF ¶¶ 124, 125, 127; RF ¶¶ 117, 118).

### The Conclusion of the CommCorp Investigation

The CommCorp investigation continued to remain unresolved at the end of 2002. (PF ¶ 130). In December 2002, CommCorp sent Przydzial a summary of its Final Determination, which contained findings against the GLWIB totaling $182,361. (RF ¶ 128; Pl.'s Ex. JJ). In its Final Determination, CommCorp concluded, among other things, that the GLWIB had misappropriated the funds it had received from the Norwood Contract and had failed to disclose other sources of program in-

come. (RF ¶ 123; Pl.'s Ex. JJ). CommCorp also concluded, based on its review of the 501(c)(3) Account, that

> there were indications that funds were used for lobbying, education, and entertainment, that did not adhere to local policy guidelines and/or were unallowable activities with JTPA and WIA funds. Some checks were authorized by the GLREB Executive Director and cashed by him. Source documentation indicated there were some instances where reimbursements were made to the GLREB Executive Director for travel and associated expenses. This documentation indicated that some of the reimbursements were for expenses not allowable by JTPA and WIA. Documentation included a City of Lowell policy that required out of state travel to be approved by the City Council and required an additional signatory and established expense limitations of $50.00 per day. There was evidence that the GLREB Executive Director is a City of Lowell employee required to follow the City of Lowell policies.

(Pl.'s Ex. JJ at Bates # DEF00344; *see also* RF ¶¶ 124–27).

Thereafter, in mid-December 2002, Przydzial agreed to pay CommCorp approximately $148,000 in order to resolve the investigation. (RF ¶ 131; PF ¶ 134; GLWIB SOF ¶ 35). Przydzial expected that the funds would be paid from a surplus of about $600,000 that, according to the GLWIB's budget, had accumulated in the agency's operating account. (GLWIB SOF ¶ 35). However, after Przydzial told Richards of his intention to pay CommCorp out of the operating budget, Richards informed Przydzial that the money was not

immediately available. (RF ¶ 133; GLWIB SOF ¶ 36). According to Richards, Przydzial was very upset with him during this conversation. (RF ¶ 133).

Richards admits that he had deliberately lowered the cash balance in the GLWIB operating account by failing to draw down all of the federal funds to which the GLWIB was entitled. (GLWIB SOF ¶ 37; RF ¶¶ 143, 147; PF ¶ 142). According to Richards, he believed that Przydzial was intending to pay amounts owed as a result of the CommCorp investigation from the GLWIB's operating account, and believed, albeit incorrectly, that it would be unlawful to do so. (RF ¶¶ 141, 142; GLWIB SOF ¶ 37). He also believed that if the payments were inappropriately made from that account, the City would become liable for the payment. (RF ¶ 142). Therefore, for approximately four months in the Summer and Fall of 2002, Richards, without notifying anyone else at the GLWIB, had continued to make enough drawdowns to cover the GLWIB's costs, but had stopped doing all of the federal drawdowns because he believed it was in the City's best interests. (RF ¶¶ 143, 146; PF ¶¶ 144, 145; CF ¶ 45). As a result of Richards' actions, the GLWIB operating account contained approximately $40,000 instead of $600,000 as was reflected in the budget. (GLWIB SOF ¶ 36).

Richards did not violate any regulations or requirements by failing to perform all of the drawdowns. (RF ¶¶ 140, 148). However, because the funds were not immediately available, the GLWIB was not able to pay CommCorp until several days after Przydzial's intended payment date. (RF ¶ 135).[6]

---

6. Richards learned, in late November 2002, that it would be lawful for the GLWIB to pay the CommCorp findings out of its operating budget. (RF ¶ 15 1). Consequently, on about December 3, 2002, Richards made a drawdown request for $200,000. (*Id.* ¶ 152). However, the money was not received until after December 23, 2002, and was not avail-

### *Richards' Suspension and Ultimate Termination from the GLWIB*

An emergency meeting of the Executive Committee of the Board took place on December 23, 2002. (PF ¶ 147). At the meeting, the Executive Committee accepted Przydzial's resignation and appointed McQuaid as the Acting Executive Director of the GLWIB. (PF ¶ 148; GLWIB SOF ¶ 40; RF ¶¶ 153, 155). Additionally, because it remained unclear to the Board why the GLWIB's operating account balance had been depleted, the Executive Committee decided to hire the accounting firm of Costa, Dobbins & Associates ("Costa, Dobbins") to investigate the circumstances of the GLWIB's inability to pay CommCorp in accordance with Przydzial's commitment. (GLWIB SOF ¶ 41). While the investigation was pending, the Executive Committee did not want Przydzial or Richards to have access to the GLWIB's operating account. (*Id.* ¶ 42; RF ¶¶ 156–57). Because Przydzial had resigned, the Committee took no further action against him. (GLWIB SOF ¶ 42). However, it voted to suspend Richards indefinitely. (*Id.*; RF ¶ 156; CF ¶ 47). None of the individual defendants was involved in this decision. (GLWIB SOF ¶ 43).

Costa, Dobbins conducted an investigation and concluded that Richards had failed to draw down funds that were owed to the GLWIB. (GLWIB SOF ¶ 45; Pl.'s Ex. N). Although Richards does not dispute this conclusion, he does assert that Costa, Dobbins' investigation was unfair and biased against him. For instance, according to Richards, Costa, Dobbins interviewed numerous individuals, including Przydzial, but never spoke to Richards. (RF ¶¶ 169, 170, 174). In addition, although Costa, Dobbins was retained to

answer questions about the operation of the GLWIB, the investigation focused on Richards and information that the Board had been hearing about Richards. (RF ¶ 166).

Subsequently, on April 16, 2003, Richards met with McQuaid and other employees of the GLWIB to discuss his status at the agency. (RF ¶ 178; GLWIB SOF ¶ 46). During the meeting, Richards discussed his decision not to perform all of the federal drawdowns, including the reason for his actions. (RF ¶¶ 178, 179; GLWIB SOF ¶ 46). On April 18, 2003, McQuaid sent Richards a letter in which he stated:

> Based on the information you provided, the Greater Lowell WIB considers your actions wholly unacceptable. As you know, one of your primary duties as the Greater Lowell WIB's Fiscal Director, is to ensure that the agency receives money for the services it provides. While you indicated that your actions were to "protect the City" because the City of Lowell is ultimately responsible if funds are erroneously repaid to Commonwealth Corporation; and because you did not feel the repayment of an audit finding with "program income funds" would be appropriate, you were not authorized to make a unilateral decision to cease collecting funds on behalf of the Greater Lowell Workforce Investment Board. Moreover, your failure to inform anyone from the Greater Lowell WIB of your decision to cease collecting funds is also unacceptable.

(Pl.'s Ex. N at 2). McQuaid also offered Richards an opportunity to provide the GLWIB with additional facts "before a decision is made regarding your continued

---

able in time for the GLWIB to pay CommCorp on the intended payment date. (*Id.*

¶¶ 135, 152).

employment with the Greater Lowell WIB . . . ." (*Id.*).

On May 2, 2003, McQuaid terminated Richards' employment with the GLWIB. (RF ¶ 183; GLWIB SOF ¶ 47). According to McQuaid, Richards was discharged because of his unilateral decision not to collect funds that were owed to the GLWIB. (RF ¶ 184; GLWIB SOF ¶ 47). Neither Przydzial nor Cox was involved in or had any influence over McQuaid's decision. (GLWIB SOF ¶ 47).

Additional factual details relevant to the court's analysis are described below.

## III. *ANALYSIS*

### A. *Summary Judgment Standard of Review*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.1996) (internal citations and quotation omitted). A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." *Id.* (internal citations and quotation omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. *See id.* at 324, 106 S.Ct. at 2553. In evaluating motions for summary judgment, however, the court will not consider "conclusory allegations, improbable inferences, and unsupported speculation." *Galloza v. Foy*, 389 F.3d 26, 28 (1st Cir.2004) (internal citation omitted).

### B. *Count I v. GLWIB, GLREB, Przydzial, McQuaid and Cox Under 42 U.S.C. § 1983*

#### 1. *Claims Under 42 U.S.C. § 1983 in General*

In Count I of his First Amended Complaint, Richards asserts claims, pursuant to 42 U.S.C. § 1983, against the GLWIB, the GLREB and the three individual defendants for alleged violations of his constitutional rights. Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (quotations and citation omitted). It states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law . . . [and] second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." *Soto v. Flores*, 103 F.3d 1056, 1061(1st Cir.

1997). In the instant case, the defendants dispute both that they were acting under color of state law and that any of their conduct deprived Richards of his constitutional rights. Moreover, Przydzial and McQuaid argue that even if they violated Richards' constitutional rights, they are shielded from liability by the doctrine of qualified immunity.

As detailed herein, this court finds that there are genuine issues of material fact precluding the defendants' motions for summary judgment on the grounds that they were not acting under color of state law. However, this court also finds that Richards has failed to present sufficient evidence to support his claim that the defendants violated his constitutional rights. Accordingly, this court recommends that the defendants' motions for summary judgment be granted.

### 2. *"Under Color of Law" Requirement*

 The substance of Richards' § 1983 claim is that the GLWIB, Przydzial, McQuaid and Cox violated his First and Fourteenth Amendment rights by retaliating against him for his protected speech. (First Am. Compl. (Docket No. 11) ¶¶ 62–66). "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos,* —— U.S. ——, 126 S.Ct. 1951, 1958, 164 L.Ed.2d 689 (2006). Thus, the Constitution shields such employees from acts of retaliation based on their protected speech. *See Wagner v. City of Holyoke, Mass.,* 404 F.3d 504, 508–509 (1st Cir. 2005), cert. *denied,* —— U.S. ——, 126 S.Ct. 552, 163 L.Ed.2d 461 (2005). However, "[b]ecause section 1983 does not reach private actions, the key issue before [this court] is whether the conduct at issue in this case may be fairly attributable to the State." [7] *Barrios–Velazquez v. Asociacion de Empleados del Estado Libre Asociado de P.R.,* 84 F.3d 487, 491 (1st Cir.1996) (internal quotations and citations omitted). *See also Yeo v. Town of Lexington,* 131 F.3d 241, 248 n. 3 (1st Cir.1997) ("The question whether [plaintiff] even has a First Amendment right to assert depends on whether there is state action.").

The defendants argue that they are entitled to summary judgment on Richards' Section 1983 claim because any acts of retaliation were performed by private actors employed by a private, non-profit organization.[8] Richards, on the other hand,

---

7. "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." *Barrios–Velazquez,* 84 F.3d at 491 (quoting *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2769–70, 73 L.Ed.2d 418 (1982)). Consequently, "[t]he ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights fairly attributable to the State?" *Id.* (internal quotations omitted).

8. In support of his motion for summary judgment, defendant Cox adopted the arguments set forth by the City in its memorandum of law in support of its motion for summary judgment on Count I of the Amended Complaint. *See* Cox's Motion (Docket No. 66). The City argued, among other things, that it should not be liable under Section 1983 for any allegedly adverse employment actions taken by the individual defendants acting in their official capacities because the GLWIB was not a City agency and its employees were not working for the City. However, at all relevant times, defendant Cox was the City Manager. (PF ¶ 7). Therefore, to the extent that Cox was responsible for any of the alleged acts of retaliation against Richards, he was acting under color of state law as a public official for purposes of Richards' Section 1983 claim, and he is not entitled to summary judgment on the grounds that the GLWIB and its employees were private ac-

asserts that the defendants were acting under color of state law when they engaged in the alleged acts of retaliation because at all relevant times, the GLWIB was a City agency and the individual defendants, like Richards himself, were City employees. In other words, Richards contends that the GLWIB was not a private entity but the City itself, and that the actions of the GLWIB and its employees constituted direct state action. *See Barrios–Velazquez,* 84 F.3d at 491 (analyzing whether defendant entity was a private party or an extension of the government engaged in direct state action). Alternatively, Richards argues that even if the conduct at issue was not that of the City or its employees, it still may be fairly attributed to the state as indirect state action. "Ultimately, a finding of either direct or indirect state action would suffice to sustain [Richards'] section 1983 action." *Id.* This court finds that Richards has presented sufficient evidence to raise a genuine issue regarding whether the defendants' actions were fairly attributable to the state under either standard. Therefore, the defendants' motion for summary judgment based on their claim that they are private actors should be denied.

### a. *Direct State Action*

■ In evaluating whether the GLWIB and its employees were direct state actors "for purposes of determining the constitutional rights of citizens affected by [their] actions," the relevant inquiry is not whether the GLWIB technically was created as a private or public corporation, but rather whether it was "by its very nature, what the Constitution regards as the [State.]" *Lebron v. Nat'l R.R. Passenger Corp.,* 513 U.S. 374, 392, 115 S.Ct. 961, 971, 130 L.Ed.2d 902 (1995) (ruling that "for the purpose of individual rights guaranteed against the Government by the Constitution," Amtrak was a government entity notwithstanding a statutory disclaimer of government agency status. *Id.* at 394, 115 S.Ct. at 972). *See also Barrios–Velazquez,* 84 F.3d at 492 ("technical labels are not dispositive" of the question of whether an entity is a government agency for constitutional purposes). "[T]he character of a legal entity is determined neither by its expressly private characterization in statutory law, nor by the failure of the law to acknowledge the entity's inseparability from recognized government officials or agencies." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Assoc.,* 531 U.S. 288, 296, 121 S.Ct. 924, 931, 148 L.Ed.2d 807 (2001). Therefore, the fact that the Lowell City Council did not pass an ordinance making the GLWIB an official department of the City until after Richards had been terminated, or the fact that Richards stated in a 2001 e-mail that technically, he was not a City employee, are not dispositive of whether the GLWIB was, for constitutional purposes, a state actor during the time when the alleged wrongful acts against Richards took place.[9] *See Horvath v. Westport Library Assoc.,* 362 F.3d 147, 148–49 (2d Cir.2004) (prior determinations by State Board of Labor Relations that defendant library was not a municipal employer under state law was not relevant to the court's consideration of whether plain-

tors. *See Perkins v. Londonderry Basketball Club,* 196 F.3d 13, 18 n. 3 (1st Cir.1999) (" 'State action,' of course, includes action not only by states, but also by their political subdivisions (e.g., cities and towns)").

9. The City has cited a number of cases to support its argument that the GLWIB was not a municipal agency and Richards was not a City employee. (City's Mem. (Docket No. 73) at 6–7). None of those cases addresses the question whether, for constitutional purposes, actions taken by employees of a workforce investment board may be fairly attributable to the City.

tiff employee in § 1983 action should be afforded constitutional due process protections available to public employees).

Lebron is the leading case on the question of whether a nominally private organization is a government entity for constitutional purposes. In that case, the Supreme Court considered whether the National Railroad Passenger Corporation ("Amtrak") was a government actor for purposes of determining the constitutional rights of citizens affected by its actions, despite its congressional designation as a private organization. Lebron, 513 U.S. at 392, 115 S.Ct. at 971. The Court held that where "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." Id. at 400, 115 S.Ct. at 974–75.

■ Richards has presented enough evidence to create a genuine question as to whether, under Lebron, the GLWIB and its employees were direct state actors. It is undisputed that the GLWIB was created pursuant to the WIA as part of a national workforce preparation and employment system designed to meet certain governmental objectives. (GLWIB SOF ¶ 1; CF ¶ 4). The stated purpose for establishing local workforce investment systems under the WIA was "to provide workforce investment activities ... that increase the employment, retention, and earnings of participants, and increase occupational skill attainment by participants, and, as a result, improve the quality of the workforce, reduce welfare dependency, and enhance the productivity and competitiveness of the Nation." 29 U.S.C. § 2811. The GLWIB facilitated these goals by designing and implementing employment programs for businesses and individuals residing in the Greater Lowell area. (GLWIB SOF ¶ 1). Therefore, the record indicates that the GLWIB was created "by special law, for the furtherance of governmental objectives[.]" Lebron, 513 U.S. at 400, 115 S.Ct. at 974. See also Hall v. Am. Nat'l Red Cross, 86 F.3d 919, 921 (9th Cir.1996) (first prong of Lebron test satisfied where organization was established to further government objectives).

■ The record also contains sufficient facts to satisfy the remaining requirement of the test for direct government action set forth in Lebron, which focuses "on the degree of control" that the government has over the organization. Barrios–Velazquez, 84 F.3d at 492. The WIA specifically grants to the "chief elected official in a local area" the authority "to appoint the members of the local board for such area," in accordance with certain criteria set forth in the statute. 29 U.S.C. § 2832(c)(1)(A). Consistent with this statutory grant of authority, the GLWIB was overseen by a Board of Directors that was comprised of individuals, all of whom were appointed by the City Manager. (GLWIB SOF ¶ 2; PF ¶ 9). Although the Board remained uninvolved in the GLWIB's day-to-day personnel decisions, it was responsible for appointing the GLWIB's Executive Director, including defendants Przydzial and McQuaid. (GLWIB SOF ¶ 3). The Executive Director reported to the Board and had supervisory responsibility over other GLWIB employees. (Id.; RF ¶ 33). Consequently, the GLWIB, Przydzial and McQuaid, under the circumstances described in the record, may be deemed government actors for purposes of Richards' constitutional claims. See Lebron, 513 U.S. at 400, 115 S.Ct. at 974–75 (where government "retains for itself permanent authority to appoint a majority of the directors" of an organization, the organiza-

tion may be considered a government actor).

Moreover, the record shows that the City, in addition to maintaining control over the GLWIB's Board, and by extension its Executive Director, was ultimately responsible for the federal and state grant money that comprised a substantial part of the GLWIB's operating revenue. (RF ¶ 7). This evidence provides further support for the position that the City maintained a sufficient degree of control over the GLWIB to constitute direct state action. *See Barrios–Velazquez*, 84 F.3d at 492 (in evaluating whether organization is a direct state actor, court considers evidence of government control, including authority over organization's directors and responsibility for organization's financial losses); *Horvath*, 362 F.3d at 153 (finding that town maintained sufficient control over library to qualify it as a government actor where town appointed one-half of the library's trustees and provided all except a little more than a tenth of the library's funding). Accordingly, this court finds that the undisputed facts set forth in the record are sufficient to foreclose summary judgment for any of the defendants on the issue of direct state action.

### b. *Indirect State Action*

■■ Even if Richards could not establish direct state action, this court finds that he has presented enough facts to create a genuine dispute as to whether the defendants' actions were fairly attributable to the state under a theory of indirect state action. In determining whether the conduct of an otherwise private actor constitutes indirect state action,

> courts conventionally have traveled a trio of analytic avenues, deeming a private entity to have become a state actor if (1) it assumes a traditional public function when it undertakes to perform the

challenged conduct, or (2) an elaborate financial or regulatory nexus ties the challenged conduct to the State, *or* (3) a symbiotic relationship exists between the private entity and the State.

*Perkins v. Londonderry Basketball Club,* 196 F.3d 13, 18 (1st Cir.1999). The satisfaction of any one of these tests requires a finding of indirect state action. *Barrios–Velazquez,* 84 F.3d at 493. In addition, where "[t]he nominally private character of [an organization] is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness in applying constitutional standards to it[,]" the conclusion is that there is state action. *Brentwood Acad.,* 531 U.S. at 298, 121 S.Ct. at 932. *See also Evans v. Newton,* 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966) ("Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action."). The inquiry, under any of these theories, is necessarily fact-intensive, and the ultimate conclusion regarding state action must be based on the particular facts and circumstances set forth in the record. *See Brentwood Acad.,* 531 U.S. at 298, 121 S.Ct. at 932; *Perkins,* 196 F.3d at 18.

As detailed below, Richards has put forward sufficient facts to warrant the conclusion that the conduct of the defendants constituted indirect state action under the nexus, symbiotic relationship and entwinement theories.

### *Traditional Public Function Analysis*

Richards contends that the GLWIB should be considered a state actor because it assumed a traditional public function by providing employment assistance programs and reemployment services to

workers and the unemployed. (Pl.'s Mem. in Opp. to Przydzial's Mot. at 7–8). This is not enough to show that the GLWIB was acting under color of state law.

■ "For a private actor to be deemed to have acted under color of state law, it is not enough to show that the private actor performed a public function. Rather, the plaintiff must show that the private entity assumed powers traditionally exclusively reserved to the State." *Barrios–Velazquez*, 84 F.3d at 493–94 (internal quotations and citations omitted). Although the government involves itself in many types of activities, including employment assistance programs, "few of those activities come within the State's exclusive preserve." *Perkins*, 196 F.3d at 19. The courts have held that certain functions, including "the administration of elections, the operation of a company town, eminent domain, peremptory challenges in jury selection, and, in at least limited circumstances, the operation of a municipal park[,]" are exclusively reserved to the State. *Id.* (quoting *United Auto Workers v. Gaston Festivals, Inc.*, 43 F.3d 902, 907 (4th Cir.1995)). The plaintiff's attempt to expand this list involves "an uphill climb." *Id.*

■ Richards has cited no case law, and has presented no facts, to show that the activities performed by the GLWIB traditionally have remained within the exclusive realm of the government. Job training and development of the workforce do not constitute traditional governmental functions. The fact that the GLWIB was established pursuant to the WIA, receives government funds, and is part of a local workforce investment system that is regulated by law does not demonstrate that it carries out a traditional government function. *See Rendell–Baker v. Kohn*, 457 U.S. 830, 842, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418 (1982) (while the education of

maladjusted high school students is a public function that the state decided to provide at public expense, "[t]hat legislative policy choice in no way makes these services the exclusive province of the State."). Therefore, Richards has not made a showing of state action under a traditional public function analysis.

### Nexus Analysis

■ Under the nexus theory of state action, "a plaintiff must show a 'close nexus between the State and the challenged action of the (private) entity so that the action of the latter may be fairly treated as that of the State itself.' " *Perkins*, 196 F.3d at 19 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974) (alteration in original)). This requires more than a showing of "passive acquiescence in, or mere approval of, the challenged conduct." *Id.* Instead, the plaintiff must demonstrate "that the State 'has exercised coercive power or has provided such significant encouragement, either overt or covert,' that the challenged conduct fairly can be attributed to the State." *Id.* (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982)).

■ The court's examination must focus on the City's involvement in the allegedly unconstitutional conduct rather than on the broader relationship between the City and the GLWIB. *See id.* at 19–20 ("the focal point is the connection between the State and the challenged conduct, not the broader relationship between the State and the private entity."). In the instant case, Richards has presented evidence that raises an issue of fact regarding the level of involvement of Cox, the City Manager, in the alleged retaliatory decision to keep Richards out of City Hall. Specifically, it is undisputed that Przydzial ordered Richards to stay out of City Hall only after Cox

expressed concern to Przydzial regarding Richards' presence there. (PF ¶¶ 69, 70; GLWIB SOF ¶ 22). Moreover, Richards has presented evidence that Cox had a great deal of influence over Przydzial so that his expressions of concern regarding Richards were likely to result in actions adverse to Richards being taken. When viewed in the light most favorable to Richards, there are sufficient facts, if believed, to establish indirect state action under the nexus analysis.

### Symbiotic Relationship Analysis

 Richards further asserts that state action may be found based on the symbiotic relationship between the GLWIB and the City.[10] Under this test, a private party's acts may be attributable to the state where "the government 'has so far insinuated itself into a position of inter-dependence with (the private entity) that it must be recognized as a joint participant in the challenged activity.'" *Perkins,* 196 F.3d at 21 (quoting *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961)) (alteration in original). Thus, "in contrast to the nexus inquiry," this examination does not focus on the specific conduct complained of, but "concentrates instead on the nature of the overall relationship between the State and the private entity." *Id.*

 Although a finding of symbiosis should be based on "the totality of the circumstances, the case law suggests some

factors to which courts typically attach special weight. The most salient of these is the extent to which the private entity is (or is not) independent in the conduct of its day-to-day affairs." *Id.* "Relatedly, the circumstances surrounding a private enti-ty's use of public facilities warrant careful attention." *Id.* Another key factor is "whether the state shared in any profits made[.]" *Barrios–Velazquez,* 84 F.3d at 494 (quoting *Rodriguez–Garcia v. Davila,* 904 F.2d 90, 98 (1st Cir.1990)). "[T]his factor implicates only profits arising from the challenged conduct rather than from the relationship as a whole." *Perkins,* 196 F.3d at 21. Moreover, "for profit-sharing to be relevant, the challenged conduct must be indispensable to the financial suc-cess of the joint project." *Id.* However, "the lack of that financial characteristic is not necessarily dispositive. The test is one of interdependence and joint participation, rather than one of financial enrichment." *Rodriguez–Garcia,* 904 F.2d at 98. Addi-tional factors that bear on the question whether a symbiotic relationship exists in-clude whether the entity is financed by the state treasury and whether any judgment entered against the entity will be satisfied with state funds. *Id.* at 98–99 (relying on factors relevant to application of Eleventh Amendment immunity to determine whether symbiotic relationship exists). The court also may consider "whether the entity 'has been incorporated; ... wheth-er it has the power to sue and be sued and to enter into contracts; whether its prop-

---

**10.** The symbiotic relationship test was first articulated by the Supreme Court in *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Since that time, "the Court has either distinguished or ignored *Burton's* broadest language[,]" there-by calling into question the extent to which it remains good law. *Perkins,* 196 F.3d at 20. Nevertheless, because *Burton* has never been overruled, and the First Circuit has declined to rule on whether the parameters of the

symbiotic relationship test have in fact been narrowed, this court will assume that it re-mains intact. *See id.* at 20 ("we need not determine today either the extent to which *Burton* remains good law or whether the pa-rameters of what constitutes state action may change depending on the nature of the right at issue."). *See also Barrios–Velazquez,* 84 F.3d at 494–95 (applying the symbiotic rela-tionship test as set forth in *Burton* ).

erty is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the (entity's) operations.'" *Id.* at 99 (quoting *Ainsworth Aristocrat Int'l Party v. Tourism Co.*, 818 F.2d 1034, 1037 (1st Cir.1987) (alteration in original)).

█ The evidence in this case, when considered in light of these factors, raises a genuine dispute as to whether there was a symbiotic relationship between the City and the GLWIB. In particular, the record contains evidence indicating that the GLWIB did not operate independently of the City, but remained subject to supervision by the City over its day-to-day affairs. For example, but without limitation, the GLWIB was overseen by a Board of Directors that was appointed by the City Manager. (GLWIB SOF ¶ 2; PF ¶ 9). The Board members were responsible for selecting the GLWIB's Executive Director, who reported directly to the Board and had authority over other GLWIB employees, including its Fiscal Manager. (GLWIB SOF ¶ 3; RF ¶ 33). The record also shows that it was the Board that made the decision to suspend Richards' employment while the Costa, Dobbins investigation was pending. (GLWIB SOF ¶ 42). Thus, the City appointed Board members appear to have been intimately involved in overseeing the operations of the GLWIB.

The evidence also indicates that GLWIB employees received medical benefits, workers' compensation coverage and retirement benefits from the City. (RF ¶¶ 8, 28). Additionally, the City controlled the GLWIB employees' access to codes and passwords necessary to obtain financial information in the GLWIB's database. (Pl.'s Ex. LL at 11). Moreover, GLWIB employees were subject to the City's sexual harassment policy, its drug and alcohol policy, and its guidelines for children, family and friends in the workplace. (Pl.'s Ex. AA at Bates # DEF002025–DEF002031). It is also significant that the City was ultimately responsible for federal and state grant money that was given to the GLWIB and represented a substantial part of the GLWIB's operating revenue. (RF ¶¶ 2, 7; GLWIB SOF ¶ 6). Not surprisingly, when CommCorp launched its investigation into the GLWIB's handling of certain funds, the City monitored the investigation. (RF ¶ 84; PF ¶ 80; GLWIB SOF ¶ 25). These facts provide sufficient evidence of a symbiotic relationship between the GLWIB and the City to raise a genuine issue as to whether the defendants' actions were fairly attributable to the City.

This conclusion is further supported by evidence that, as described above, the GLWIB carried out a legislative purpose using public funds, and the City was potentially responsible for any misuse of those funds. Thus, the totality of the circumstances presented in this case indicates that the relationship between the City and the GLWIB involved such a level of interdependence that the City can rightfully be considered a joint participant in the alleged acts of retaliation. *See Perkins*, 196 F.3d at 21 ("A true symbiosis is predicated on interdependence and joint participation.").

### Entwinement

█ Finally, this court concludes that the evidence presents a genuine issue as to whether there was indirect state action under a theory of entwinement. Under this test, "a private entity may be classed as a state actor 'when it is entwined with governmental policies' or when government 'is entwined in [its] management or control.'" *Logiodice v. Trustees of Maine Cent. Inst.*, 296 F.3d 22, 27 (1st Cir.2002) (quoting *Brentwood*, 531 U.S. at 296, 121 S.Ct. at 930) (additional quotations and citation omitted). Here, Richards has presented evidence that the City was en-

twined in the management and control of the GLWIB.

■ In the instant case, a variety of facts support the conclusion that "[t]he nominally private character of [the GLWIB] is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings." *See Brentwood,* 531 U.S. at 298, 121 S.Ct. at 932. For instance, as described above, employees of the GLWIB were treated as public employees to the extent of being eligible for medical, retirement and workers' compensation benefits from the City. (RF ¶¶ 8, 28). Additionally, the GLWIB was overseen by a Board of Directors comprised of members all of whom were appointed by the City. (GLWIB SOF ¶ 2; PF ¶ 9). While the Board remained uninvolved in the GLWIB's personnel decisions, it did appoint the agency's Executive Director, who had authority over GLWIB employees as well as its day-to-day affairs. (GLWIB SOF ¶ 3; RF ¶ 35). Furthermore, although the City did not profit from the activities of the GLWIB, it had a close financial relationship with the GLWIB. Thus, the City had responsibility for state and federal grant funds received from the United States Secretary of Labor through the Commonwealth, and the GLWIB had responsibility for allocating those funds within the Greater Lowell area. (City Ex. 6 at 2–3). Moreover, the GLWIB was included as part of the City's single audit. (RF ¶ 9). Taken together, all of these facts support a conclusion of entwinement. In fact, the record indicates that the City and the GLWIB were entwined to such a degree that the Massachusetts Department of Labor and Workforce Development described the relationship between the City and the organizational and decision-making structure of the GLWIB as unclear and noted a lack of differentiation between the responsibilities of the GLWIB and the City. (Pl.'s Ex. NN). In sum, the plaintiff has presented sufficient evidence to avoid summary judgment for the defendants on Count I of the Amended Complaint based on the issue of state action.

### 3. The Claimed Constitutional Violation

In order to survive summary judgment on Count I of his Amended Complaint, Richards must also present evidence that the defendants' conduct "worked a denial of rights secured by the Constitution or by federal law." *Soto,* 103 F.3d at 1061. Richards contends that the defendants violated his First Amendment rights to free speech by retaliating against him for reporting misconduct at the GLWIB to CommCorp and for his discussions with CommCorp, the FBI and others during the ensuing investigation. As detailed herein, however, Richards' actions were not constitutionally protected. Therefore, the defendants' motion for summary judgment should be allowed.

■ "It is well settled that 'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Garcetti,* 126 S.Ct. at 1955 (quoting *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1688, 75 L.Ed.2d 708 (1983)).[11] However, "[w]hen analyzing an employee's claim that his governmental employer retaliated against him for speak-

---

11. The fact that Richards was an at-will employee does not justify his discharge from employment if the decision to discharge him was based on his constitutionally protected speech. *See Rutan v. Republican Party of Illinois,* 497 U.S. 62, 72, 110 S.Ct. 2729, 2735–36, 111 L.Ed.2d 52 (1990) (lack of any entitlement to an employment position is immaterial to a First Amendment claim).

ing out, the court's task is to seek 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 51 (1st Cir.2003) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968)) (second alteration in original). Supreme Court precedent regarding the court's obligation to strike this balance has yielded the following three-part test adopted by the First Circuit:

> First, the court must determine, on the basis of the content, form, and context of a given statement, as revealed by the whole record, whether the employee was speaking as a citizen upon matters of public concern, or, alternatively, as an employee upon matters only of personal interest. If an employee's speech cannot be fairly characterized as constituting speech on a matter of public concern, then its First Amendment value is low and a federal court is not the appropriate forum in which to review the wisdom of a personnel decision arising therefrom.

> Second, if the employee did speak out on a matter of public concern, the court must first balance the strength of the employee's First Amendment interest, and any parallel public interest in the information which the employee sought to impart, against the strength of the countervailing governmental interest in promoting efficient performance of the public service the government agency or entity must provide through its employees.

> \* \* \*

> Third, and finally, if the court determines that the public employee's First

Amendment interests in speaking out outweigh a legitimate governmental interest in curbing the employee speech, the plaintiff-employee must show that the protected expression was a substantial or motivating factor in the adverse employment decision; and, if the plaintiff meets this test, the defendant governmental entity must be afforded an opportunity to show by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct.

*O'Connor v. Steeves*, 994 F.2d 905, 912–13 (1st Cir.1993) (internal quotations, citations and alterations omitted). The defendants have moved for summary judgment based on each part of this test. As described below, this court concludes that Richards has not presented evidence that is sufficient to overcome summary judgment for the defendants at the first stage of the analysis.

### a. First Amendment Protection for Employee Speech Under the Supreme Court Decision in Garcetti

The GLWIB and McQuaid have moved for summary judgment under the first part of the test articulated by the First Circuit in *O'Connor* on the grounds that Richards cannot demonstrate that he was speaking as a citizen on matters of public concern. In particular, the defendants contend that all of the statements giving rise to the alleged acts of retaliation were made while Richards was acting in his capacity as the Fiscal Manager of the GLWIB, and that under the Supreme Court's recent decision in *Garcetti*, the First Amendment provides no protection from discipline for speech made pursuant to a public employee's official duties. (*See generally* GLWIB Supp. Mem. (Docket No. 111)). As described below, the application of *Garcetti* to the instant case fore-

closes Richards' claims of retaliation for speech that he made pursuant to his employment responsibilities, and this court concludes, based on the undisputed facts, that all of Richards communications with CommCorp, as well as the statements that he made at the 2002 Finance Subcommittee meeting, occurred while Richards was performing his duties as Fiscal Manager of the GLWIB.[12]

In *Garcetti*, the Supreme Court considered whether a deputy district attorney had spoken as a citizen upon matters of public concern and was therefore entitled to First Amendment protection from retaliatory discipline for views that he had expressed in a memorandum written pursuant to his employment duties, and in testimony he had given in court consistent with the memorandum. *See Garcetti*, 126 S.Ct. at 1955–57. The Court held, in a 5 to 4 decision, "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 1960. Because there was no dispute that the deputy district attorney's "expressions were made pursuant to his duties as a calendar deputy," any restrictions on his speech in the form of retaliation did not "infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 1959–60.

The controlling factor in the Court's decision that the speech at issue did not warrant First Amendment protection was that the statements were made pursuant to the deputy district attorney's official duties. *Id.* at 1960. Thus, *Garcetti* teaches that

[e]mployees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government.... When a public employee speaks pursuant to employment responsibilities, however, there is no relevant analogue to speech by citizens who are not government employees.

*Id.*, 126 S.Ct. at 1961. The question before this court then is whether Richards' speech was made pursuant to his duties as the Fiscal Manager of the GLWIB or whether the statements at issue were made outside the scope of his employment in his capacity as an ordinary citizen.

Richards argues that there is at least a question of fact as to whether or not his speech was made in connection with the

12. The parties agree that in addition to his statements at the Finance Subcommittee meeting and his discussions with CommCorp, Richards discussed the alleged mishandling of funds at the GLWIB with the FBI, the press, state and federal agencies, and City Councilors, among others. (Pl.'s Reply to GLWIB Supp. Mem. (Docket No. 113) at 5; GLWIB SOF ¶ 33; RF ¶¶ 88, 91). However, it is not necessary to determine whether, under *Garcetti*, such communications constitute constitutionally protected speech because the record is entirely void of any evidence linking Richards' discussions with the press, governmental agencies or City officials to the alleged acts of retaliation. Furthermore, although Przydzial suspected that Richards may have "had a hand" in the FBI investigation, Richards kept the fact of his discussions with the FBI confidential, and there are no facts linking Przydzial's behavior to any actual communications between Richards and the FBI. (PF ¶ 79; RF ¶ 89; Pl.'s Ex. F at 332). Since Richards cannot show "that the protected expression was a substantial or motivating factor in the adverse employment decision," these communications cannot form the basis for Richards' First Amendment claim. *See O'Connor*, 994 F.2d at 913.

performance of his official duties as Fiscal Manager of the GLWIB. Specifically, Richards argues that his job responsibilities excluded any oversight of the 501(c)(3) Account of which he complained, and that his official duties did not include his voluntary participation in CommCorp's expanding investigation. (Pl.'s Reply to GLWIB Supp. Mem. (Docket No. 113) at 4–5). Additionally, Richards argues that his attendance at the May 2002 Finance Subcommittee meeting and the statements that he made there were unconnected to his role as the GLWIB's Fiscal Manager. (*Id.* at 6–8). This court finds, however, that even when the evidence is viewed in the light most favorable to the plaintiff, Richards' discussions with CommCorp, both at the outset of the investigation and during the pendency of the investigation, occurred while Richards was carrying out his employment responsibilities. Similarly, this court concludes that Richards was acting in his capacity as Fiscal Manager of the GLWIB when he made statements about Przydzial at the 2002 meeting of the Finance Subcommittee of the City Council.

### b. *Richards' Communications with CommCorp*

Although the Supreme Court in *Garcetti* had "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate," it did emphasize that "[t]he proper inquiry is a practical one" that should not depend on a written job description. *Garcetti*, 126 S.Ct. at 1961–62. Here, the facts demonstrate that Richards was acting not solely as a concerned citizen, but in his professional capacity as the Fiscal Manager of the GLWIB when he notified CommCorp of his concerns about the 501(c)(3) Account and continued to communicate with CommCorp throughout its broadening investigation. The record shows that as Fiscal Manager of the GLWIB, Richards was responsible for the proper classification, accounting and reporting of federal and state grant funds received by the GLWIB, for the maintenance of proper accounting records, and for maintaining the GLWIB's operating account. (RF ¶¶ 19, 20, 139). In that capacity, Richards assumed responsibility for ensuring that federal program income, including any such income resulting from the Norwood Contract, was appropriately deposited in the GLWIB's operating account. (RF ¶¶ 19, 52). There is no dispute that the reporting of any suspected financial improprieties to CommCorp, such as the inappropriate disposition of federal program funds into the 501(c)(3) Account rather than into the GLWIB's operating account, was within the scope of Richards' employment responsibilities. (RF ¶ 93). Furthermore, as a practical matter, Richards cannot claim that once he reported his suspicions to CommCorp and CommCorp launched its investigation, his continuing participation in the investigation was independent of his role as Fiscal Manager. Rather, Richards' continuing cooperation with the GLWIB's oversight agency was a natural and logical extension of his professional decision to report financial improprieties at the GLWIB. Therefore, although the plaintiff's job description technically may not have included his continuing participation in CommCorp's expanding investigation, this court concludes that his agreement to do so occurred within the scope of his employment and did not constitute "the kind of activity engaged in by citizens who do not work for the government." *Garcetti*, 126 S.Ct. at 1961. Accordingly, under *Garcetti*, Richards is not entitled to First Amendment protection for any of his communications with CommCorp.

### c. *Richards' Statements at the Subcommittee Meeting*

Richards' participation in the 2002 Finance Subcommittee meeting and the

statements that he made there present a slightly closer question. The defendants have presented evidence that Richards did not attend the meeting as a representative of the GLWIB, but instead requested an invitation from one of the City Councilors so that he could keep abreast of developments in the CommCorp investigation. (GLWIB SOF ¶ 25; PF ¶ 82). Richards contends that these facts are sufficient to create a genuine dispute as to whether his statements were made while performing his professional responsibilities or while he was acting as an ordinary citizen. (Pl.'s Reply to GLWIB Supp. Mem. at 6–7). This court disagrees. Consideration of both the content of the remarks and the context in which they were made compels the conclusion that Richards was speaking as an official of the GLWIB.

Following the meeting, Richards prepared a memorandum describing his statements there. (City Ex. 15). The memorandum is directed to the GLWIB's files from "Dennis M. Richards, Fiscal Manager," thereby indicating that Richards viewed his participation in the meeting as part of his professional activities. (Id.). The substance of the document reveals that Richards had been invited to the meeting by the Chairperson of the Finance Subcommittee. (Id.). It also lists the names and titles of those who attended the meeting, including a number of City Councilors, various City officials, the Director of the GLWIB, a CommCorp representative and a reporter. (Id.). Thus, the memorandum indicates that the meeting was not open to the public, that all of the participants were acting within the scope of their professional capacities, and that Richards would not have been invited to attend the meeting but for the fact that as Fiscal Manager of the GLWIB, he was intimately involved in the matters to be addressed by the City Council.

Additionally, the substance of Richards' statements at the Subcommittee meeting indicates that he was purporting to act as a spokesperson for the GLWIB. By his remarks, Richards informed the City Councilors that Przydzial had called CommCorp and requested that the monitors not attend the meeting. (CF ¶ 38). These statements had official significance in that they relayed information that Richards allegedly had obtained while working at the GLWIB. In addition, Richards was notifying the City Council about the status of the official investigation concerning financial irregularities at the GLWIB—an investigation in which, as detailed above, Richards was involved in his official capacity as Fiscal Manager. Furthermore, Richards' comments did not constitute the type of speech ordinarily engaged in by citizens who did not work for the GLWIB. See Garcetti, 126 S.Ct. at 1960 (contrasting speech made pursuant to official duties with "the expressions made by the speaker in Pickering, whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day"). Therefore, even if Richards did not attend the meeting as a formal representative of the GLWIB, the undisputed facts warrant the conclusion that Richards' statements were made pursuant to his employment responsibilities and, therefore, are not constitutionally protected under Garcetti.[13] Therefore, the defendants are entitled to summary judgment on Count I of the Amended Complaint.

---

**13.** Having concluded that Richards has failed to present sufficient evidence to support his First Amendment retaliation claims against any of the defendants at the first stage of the analysis set forth in O'Connor, it is unnecessary to determine whether the defendants would be entitled to summary judgment under the second and third parts of the test. Similarly, because this court has determined that all of the defendants are entitled to summary judgment with respect to Count I of the Amended Complaint on the basis of Garcetti,

## 82

### C. State Law Claims (Counts II–V)

 The defendants also have moved for summary judgment with respect to each of Richards' state law causes of action set forth in Counts II through V of the Amended Complaint. However, because the dismissal of Count I on summary judgment will deprive the court of its original juridiction, this court recommends that the state law claims be dismissed pursuant to 28 U.S.C. § 1367(c).

### IV. CONCLUSION

For all of the reasons set forth above, this court recommends to the District Judge to whom this case is assigned that the defendants' motions for summary judgment (Docket Nos. 52, 55, 61 and 66) be ALLOWED with respect to Count I of the Amended Complaint and that the court dismiss the remaining state law claims pursuant to 28 U.S.C. § 1367(c).[14]

September 8, 2006.

---

there is no need for this court to address Przydzial's and McQuaid's arguments that they are entitled to qualified immunity, or the defendants' assertion that neither the GLWIB nor the individual defendants acting within their official capacities may be held liable under § 1983 based upon a theory of municipal liability.

14. The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir.1988); United States v. Valencia–Copete, 792 F.2d 4, 6 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604–605 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378–79 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also Thomas v. Arn, 474 U.S. 140, 153–54, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3–4 (1st Cir.1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150–51 (1st Cir.1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).